339 F.2d 295
 DAVID CRYSTAL, INC., Libellant-Appellant-Appellee,
v.
The CUNARD STEAM-SHIP CO. Ltd., Respondent-Petitioner-Appellant-Appellee, and
John T. Clark & Son, Respondent-Impleaded-Petitioner-Appellant-Appellee, and
Penson & Co., Respondent-Impleaded-Appellee.
 No. 8.
 Docket 28656.
 United States Court of Appeals Second Circuit.
 Argued October 19, 1964.
 Decided December 9, 1964.
 
 John L. Quinlan, of Bigham, Englar, Jones & Houston, New York City, for libellant-appellant-appellee.
 Henry C. Blackiston, of Lord, Day & Lord, New York City (John F. O'Connell, Franklin G. Hunt, New York City, on the brief), for respondent-petitioner-appellant-appellee.
 William Weymar, Jr., of Atkins & Weymar, New York City (Joseph B. McDonald, New York City, on the brief), for respondent-impleaded-petitioner-appellant-appellee.
 Enrico S. Sanfilippo, New York City, for respondent-impleaded-appellee.
 Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.
 KAUFMAN, Circuit Judge.
 
 
 1
 Our problem on this appeal, not devoid of reticulate aspects, is to determine which one of four parties shall bear the loss for the misdelivery of twenty-eight cases of shirts: the buyer and owner David Crystal, Inc., the carrier Cunard Steam-Ship Co. Ltd., the carrier's stevedore John T. Clark & Son, or the buyer's customs broker Penson & Co. After a trial in admiralty, the District Court granted Crystal recovery from Cunard and recovery over by Cunard from Clark, but denied Crystal direct recovery from Clark and dismissed Crystal's and Clark's claims against Penson for lack of admiralty jurisdiction. Crystal, Cunard, and Clark appeal from those portions of the decree adversely affecting their respective interests. We uphold the decree placing the ultimate responsibility for the loss upon Clark and find it unnecessary, because of this result, to reach the jurisdictional questions raised by the claims against Penson.
 
 
 2
 The basic facts may be stated simply enough although the resolution of liability is quite complex. Clark unloaded the shirts from Cunard's vessel to a pier in Brooklyn, N. Y., and then misdelivered them upon the presentation of a forged Penson delivery order, obtained through the complicity of one of Penson's employees.
 
 
 3
 For a full understanding of the ramifications of this case, however, a further exposition of the facts is in order. On October 31, 1957, Cunard received the shirts purchased by Crystal at Le Havre, France, for shipment aboard its vessel, the SS Trelyon. The bill of lading named Penson, Crystal's customs broker, as consignee. On November 14, after Penson received Cunard's arrival notice and obtained clearance from Customs, the file folder relating to the shipment was given to one Jose Perez, its traffic clerk. Perez prepared and signed a delivery order naming a trucker, Arrow Carriers, as agent to accept delivery at the pier. He affixed the order to the outside of the folder and placed it on his desk with other completed orders destined for the outgoing mail basket.
 
 
 4
 But shortly after Perez performed this task, the chain of events intended to effect proper delivery of the shirts to Crystal was cut at one of its most vital links. It appears that as Perez momentarily left his desk, Louis Segarra, a fellow employee who had been plotting with outsiders to steal the valued shirts, surreptitiously took the delivery order, together with a blank form. He gave the original and blank orders to Rigley, a confederate, who together with one Orlando, filled out the blank order, inserting the name of a fictitious trucker, C & L Trucking Co., in place of Arrow. They also forged Perez' signature on the new delivery order and destroyed the original.
 
 
 5
 The next morning Rigley and Orlando appeared at the pier where Clark's stevedores were unloading the Cunard vessel. They presented the forged delivery order to Keane, Clark's chief delivery clerk, and then waited until late in the afternoon while the documents were checked and the shirts loaded on their truck.[1]
 
 
 6
 Crystal soon discovered its loss and commenced this suit by filing its libel against Cunard for breach of the contract of ocean carriage. Cunard then impleaded Clark seeking indemnity for breach of its stevedoring contract. Clark, in turn, impleaded Penson claiming negligence on its part. Both Clark and Penson answered the libel although Crystal did not assert causes of action against either until amendments to the libel were permitted by the judge upon conclusion of the trial.
 
 
 7
 The District Court held, as we have already indicated, that Cunard was fully liable to Crystal, but was entitled to be indemnified by Clark. We turn now to examine each phase of that conclusion.
 
 I. Crystal v. Cunard
 
 8
 Because Crystal's claim against Cunard was for breach of the contract of ocean carriage, we must look first to the bill of lading to determine the parties' rights and duties. The District Court was of the opinion that the bill of lading became inoperative once the cargo was discharged. We believe, however, that it is more precise to say that although the bill continued to govern the parties' relationships after discharge, its terms did not insulate Cunard from liability. It is true that the bill provided that Cunard's responsibility would cease when delivery was made from the ship's deck and that if the consignee did not immediately receive the goods, Cunard could simply abandon them on the wharf. But these clauses were clearly null and void under the Harter Act's restrictions against certain stipulations seeking to relieve carriers from liability. 46 U.S.C. § 190.
 
 
 9
 The bill of lading also provided that Cunard had the option to land or store the cargo "at the sole expense and risk of Consignee in the Warehouses provided for that purpose." But it is clear that Cunard did not take advantage of that option, for it discharged the goods in the custody of its stevedore on a pier and did not deposit them in a warehouse.
 
 
 10
 Since the bill of lading did not specify Cunard's obligations when it discharged the shirts to Clark, the law steps in to fill the lacuna; this it does by properly characterizing Cunard's status as a bailee. Cf. The Italia, 187 F. 113 (2d Cir. 1911); Standard Brands, Inc. v. Nippon Yusen Kaisha, 42 F.Supp. 43 (D.Mass. 1941). And there is no sound reason to alter its bailee status simply because it landed the shirts on Clark's pier. Absent a valid contract to the contrary, a bailee remains liable for the safety of the goods in whatever hands he may place them; exceptions that may arise when a consignee fails to accept the goods have no relevance to this case. Cf. The Eddy, 5 Wall. 481, 72 U.S. 481, 495, 18 L.Ed. 486 (1867).
 
 
 11
 It is interesting that there is no direct precedent in the law of admiralty establishing the standard of responsibility of a bailee who misdelivers cargo. Because of this void and mindful that maritime law draws on many sources, the able District Court judge in order to shape the appropriate maritime law properly resorted to state decisional law, see 1 Harper & James, Torts 156 (1956), various uniform acts, including the Federal Bills of Lading Act, 49 U.S.C. §§ 81-124, as well as the Uniform Commercial Code, and finally fastened appropriately on the rule articulated in the Restatement, Torts § 234 (1934).
 
 
 12
 The Restatement rule suggests that a bailee is absolutely liable for misdelivering cargo, unless his mistake as to the person entitled to receive the goods was induced by the bailor. We agree with the District Court that considerations of uniformity and the need for certainty in commercial transactions justified application of this widely accepted rule to maritime transactions. It is not prudent to have a rule which varies a bailee's liability depending upon his proximity to the sea and susceptibility to admiralty's jurisdiction. At the same time, the rule of absolute liability represents a sound allocation of responsibility for the bailee is in a better position than the bailor to establish procedures to minimize the risk of misdeliveries and to insure against the few misdeliveries that will inevitably occur despite the most careful precautions.
 
 
 13
 Cunard was therefore absolutely liable for the misdelivery unless (a) certain bill of lading provisions not yet considered eliminated or reduced such liability or (b) the misdelivery was induced by Crystal or Penson, acting in its behalf. One of these provisions, the exception for acts of "thieves," seems to us inapplicable because the loss of the cargo here is more appropriately characterized as due to misdelivery rather than theft. It is true that under New York law a taking by false pretenses is larceny, Penal Law, McKinney's Consol.Laws, c. 40, § 1290, but we do not believe that the broad definition of theft in the criminal law should be extended to a commercial contract. See Freedman v. George W. Bush & Sons Co., 284 Pa. 16, 130 A. 263 (1925). The law already recognizes this distinction for a warehouseman is absolutely liable for misdeliveries but is responsible in trespassory theft cases only where he has been negligent. See North American Smelting Co. v. Moller S.S. Co., 204 F.2d 384 (3d Cir. 1953). These differing standards are based on sound policy considerations since it is proper that a warehouseman should bear a greater responsibility for being duped by false pretenses than for thefts that cannot be avoided despite the exercise of ordinary care.
 
 
 14
 Cunard's attempt, elsewhere in the bill of lading, to limit its liability to £ 20 per package also must fail. This clause was clearly void while the goods were at sea, for the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5), does not permit limitations under $500. It seems to us that once the law declared this clause void it should remain void forever. It would be unfair to permit the void clause to spring to life once the goods reached land, for by then Crystal had justifiably relied on the clause's inapplicability in making its decision on adequate cargo insurance. Moreover, the limitation provision in the bill of lading does not explicitly cover post-arrival damage. Furthermore, the £ 20 limitation, when contrasted with COGSA's $500 figure, is such an arbitrarily small sum that it should be void as contrary to public policy. Cf. Isbrandtsen Co. v. United States, 201 F.2d 281 (2d Cir. 1953).
 
 
 15
 We turn, finally, to what is for us the most troublesome question on this phase of the case: whether Crystal is estopped from recovering because the misdelivery was induced by Penson's alleged negligence. The law is clear that if Penson's negligence caused the misdelivery, Crystal would be barred from recovery. MacAndrews & Forbes Co. v. United States, 23 F.2d 667 (3d Cir. 1928). Indeed, the chain of estoppel is firmer and shorter here than in MacAndrews, where an owner of furs was estopped from recovering from a carrier by imputing to the owner the negligence of a trucking firm employed by his customs broker. We are not inclined to upset the District Court's holding that Penson could not be faulted for its office procedures or for hiring and retaining Segarra. The key issue on this question is whether Segarra was acting within the scope of his authority when he took the valid delivery order and the blank form from Perez' desk.
 
 
 16
 As we read the record, Segarra's authority to prepare and sign delivery orders and hand them to truckmen did not extend to the commercial shipment involved in this case. Segarra was allowed to take delivery orders from Perez' desk but only for temporary use in answering inquiries and not for delivery to truckmen. While it is true that by trusting Segarra to this limited extent Penson may have facilitated the plot, we are unwilling to stretch the tenuous line of causation and say that Penson "proximately caused" the misdelivery. See Saugerties Bank v. Delaware & Hudson Co., 236 N.Y. 425, 141 N.E. 904 (1923). Similarly, despite Segarra's authority to take the blank form, it seems clear that this authority did not extend to completing the form; a forgery by a mere custodian of documents is not binding on the principal. See, e. g., Ehrich v. Guaranty Trust Co., 194 App.Div. 658, 186 N.Y.S. 103 (1921), aff'd, 233 N.Y. 637, 135 N.E. 950 (1922); Manhattan Life Ins. Co. v. Forty-Second & Grand St. Ferry R. R. Co., 139 N.Y. 146, 34 N.E. 776 (1893).
 
 
 17
 A sound reason stands behind our holding that Segarra was not acting within the scope of his employment in the circumstances present here. If an employer were to be held liable every time an employee took advantage of a general authority to move freely about his offices, he would be placed in the role of an absolute insurer without the ability to protect himself. Instead, the law limits vicarious liability to situations where the wrongdoing can be traced to abuse of a more carefully defined authority. Here, it is clear that Segarra's actions were not sufficiently related to his delegated authority and for that reason Penson cannot be charged with responsibility for the misdelivery.
 
 II. Cunard v. Clark
 
 18
 We also agree with the District Court's holding that Clark must indemnify Cunard because the misdelivery was a breach of its implied warranty of workmanlike service. The Supreme Court recently indicated, in Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), that the implied warranty may be breached even where, as here, there has been no showing of negligence on the stevedore's part. Surely, Clark was in a far better position to prevent the misdelivery than Cunard and liability should properly fall upon the party who is best situated to adopt protective measures.
 
 
 19
 It is true that Clark's contact with Cunard disclaimed responsibility for "losses resulting from possible theft or errors in delivery." But such disclaimers are not favored by the courts and must be strictly construed. See 2 Harper & James, Torts § 28.25 (1956); 78 Harv.L.Rev. 191 (1964); cf. Pettus v. Grace Line, Inc., 305 F.2d 151, 155 (2d Cir. 1962). Somewhat similar considerations of strict construction led us to hold that a theft exception in Cunard's bill of lading, also found in the Clark-Cunard agreement, did not apply to the facts of this case. And because, as between Cunard and Clark, strong policy considerations favor placing responsibility for the misdelivery on Clark, any attempt to escape from that responsibility should be unequivocally expressed. We are not disposed to extend the agreement's exemption of "errors in deliveries" to "misdeliveries." A "misdelivery" in maritime practice is a technical term of art applied where there is a complete failure to deliver goods to the owner, consignee, or other authorized holder of a bill of lading. Although the term "errors in delivery" is unfamiliar in this context, we are inclined to limit it to delays, incomplete deliveries, or deliveries of the wrong cargo that are ultimately rectified. Indeed, the very novelty of the expression explains our reluctance to treat it as synonymous with "misdeliveries," the term that naturally leaps to mind to characterize what happened here.
 
 
 20
 We believe Cunard is also entitled to reimbursement from Clark for attorneys' fees and disbursements incurred in defending against Crystal's claim. See Paliaga v. Luckenbach S.S. Co., 301 F. 2d 403 (2d Cir. 1962). We cannot accept the stevedore's suggestion that Cunard should be denied recovery because it could have avoided these expenses by asking Clark to defend the action on its behalf. Crystal sued Cunard only and when Cunard impleaded Clark it invoked the personal defenses already discussed against Cunard. Because those defenses were substantial and might have succeeded, Cunard's only safe course was to defend against Crystal's claims. Having forced Cunard into this position, Clark cannot now be heard to say that it should not be charged for litigation expenses unnecessarily incurred.
 
 III. Crystal v. Clark
 
 21
 In light of the foregoing dispositions, which we have approved, the District Court judge saw no need to consider Crystal's direct claim against Clark, added by post-trial amendment. We recognize that because we affirm Crystal's judgment against Cunard and Cunard's against Clark, the question whether Crystal should be allowed to recover against Clark as well becomes academic. Indeed, because the issue lacks practical significance in this case, we accept without detailed analysis and discussion the authorities that impose jurisdictional obstacles to such direct recovery, see 1 Benedict, Admiralty, § 2, at 2 & n. 4 (6th ed. Knauth 1940); 3 Moore, Federal Practice ¶ 14.20, at 669-70, and ¶ 14.27 [1], at 721 & n. 1 (2d ed. 1963), despite our observation that adherence to those precedents often needlessly fragments law suits and might deserve further consideration in the appropriate case.
 
 IV. Crystal v. Penson; Clark v. Penson
 
 22
 In view of the conclusions we have reached, which are founded in part on Penson's freedom from responsibility for the misdelivery, the issues raised by the claims against Penson become wholly academic. Accordingly, we see no need to discuss the District Court's disposition of the jurisdictional problems raised by those claims.
 
 
 23
 The interlocutory decree is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Although Clark followed customary procedures in delivering the shirts, hindsight indicates that if its employees had been more alert, the conspiracy would have been foiled. For example, although Keane had never before seen a delivery order naming C & L Trucking, he made no inquiry of this and other suspicious circumstances and did not attempt to verify the indecipherable forged signature on the delivery order
 
 
 
 24
 FRIENDLY, Circuit Judge (concurring and dissenting):
 
 
 25
 I join in the portions of the opinion dealing with the claims of Crystal against Cunard and Clark and with the claims of all three against Penson. But I disagree with the refusal to give effect to what seems entirely clear exculpatory language in the contract between Cunard and Clark.
 
 
 26
 The full language from the contract we must construe is set out in the margin, Clark being described as "Contractor" and Cunard as "Agent."[1] Endeavoring to put myself in the place of a draftsman not endowed with hindsight, I do not see how he could realistically have been expected to do better in disclaiming liability for the loss that here occurred. Not content to rely solely on bare words of disclaimer, he placed the problem in its business setting. Clark told Cunard that it would try to hire terminal employees of "integrity and ability"; that it would be liable for losses resulting from their lack of integrity; but that it would not be liable for losses resulting from "theft," save as expressly provided in the second sentence, or from "errors" — the latter clearly arising from lack of "ability" of the employees and the former possibly so. Clark would naturally have thought that with this protection it could rely on the usual fidelity bond against fraud by its employees, on a $2,000,000 liability policy tailored to the risks of theft for which it had accepted responsibility, and on a $2,000,000 policy required by another clause to cover damage to property resulting from its negligence. Other risks remained with Cunard, which would insure or self-insure against them. We now frustrate this well articulated contractual plan and bestow a windfall on Cunard or its insurer because the draftsman did not also use the talismanic word "misdeliveries" — "the term that naturally leaps to mind to characterize what happened here."
 
 
 27
 I must assume it would have leapt to my brothers' minds, but I doubt it would have to mine. Even after the education from which I have now benefited, "errors in delivery" seems a completely apt way to describe delivery to a wrong person. I fail to understand why, as a matter of language, although deliveries at a wrong time or to a wrong place or other wrong deliveries that are ultimately rectified would be "errors in delivery," unrectified deliveries to a wrong person are not. I am equally unable to comprehend on what basis, especially in view of the explanatory language at the beginning of the clause, Clark should be thought to have been at pains to exclude liability for small errors in delivery, e. g., delays, while accepting liability for large ones, or how Cunard could have reasonably supposed this to be the effect of the words used. If the draftsman had employed a long string of words as was the style a half century ago, omission of the one considered most technically apt might indeed be thought significant; but one good reason for not using ten words where one will do is to prevent argument of that sort.
 
 
 28
 I likewise see no ground for invoking some artificial rule of construction to cut down on the natural meaning of the words. Whatever may be the case with contracts of adhesion, when a contract is made at arms' length between two business concerns like Cunard and Clark, there is no justification for courts looking with "disfavor" on the allocation between them of risks from the wrong delivery of cargo on a busy pier; our duty is to read the words, in their setting, with icy neutrality. One of the world's great shipping lines surely does not need the help of this court in working out its contracts, and ought not get it in working out of them. Pettus v. Grace Line, Inc., 305 F.2d 151, 155 (2 Cir. 1962), held that an agreement of a stevedore to be liable for negligence and to carry insurance against it did not negate the implied obligation to perform workmanlike services "in the absence of an express disclaimer"; that decision is not apposite here, and a text discussion of disclaimers on products liability is even less so. To be sure, disclaimers must be clear enough for a reasonable man to understand; but that does not mean that courts ought read them as they used to read indictments, where the omission of any word was fatal.
 
 
 
 Notes:
 
 
 [1]
 "As terminal employees, engaged in clerical services of tallying and delivery of cargo, are selected so far as possible according to their integrity and ability, the Contractor cannot assume responsibility for losses resulting from possible theft or errors in delivery or receiving of cargo except where fraud on the part of these employees is clearly evident. However, the Contractor will indemnify and save harmless Agent against any and all cargo claims caused by theft or pilferage when such cargo is placed in the permanent pier cribs in the care, custody and control of the Contractor, and/or the care, custody and control of any protective organization engaged by Agent, and provided the Contractor's liability is not in excess of the liability of Agent to shippers, owners or consignees of such cargo, and provided further that Contractor's liability shall not be in excess of two million ($2,000,000.00) dollars. * * *"
 
 
 ANDERSON, Circuit Judge (concurring):
 
 29
 I concur in Judge Kaufman's opinion except that on the troublesome question of Clark's liability to Cunard, I reach the same result by a somewhat different approach.
 
 
 30
 In broad aspect Cunard had a continuing duty, as bailee, until the cargo was delivered to its consignee or the consignee's authorized agent. In contracting to take over the care and custody of the cargo and to deliver it to the consignee or its agent, Clark was fully aware, both from Cunard's purpose in making the contract and from Clark's own position as warehouseman, that it, Clark, was assuming the duties of a bailee. It must further have understood that these duties included delivery of the cargo to the right person, and that it could be held liable for failing to make that delivery even in case the cargo was converted to another's possession through no fault of Clark's. Restatement of Torts, § 234. In an arm's length contract Clark and Cunard agreed upon certain exculpatory clauses which limited the absolute nature of the bailee's liability imposed by law. As such, these clauses must be narrowly construed. 8 Am.Jur.2d Bailments § 142.
 
 
 31
 So regarded, I do not believe that the first sentence of ¶ XXV of Clause 3 of the Cunard-Clark contract (printed in Footnote 1 of the dissenting opinion, supra) should be interpreted to relieve Clark of the responsibility for the loss of the cargo in this case. That sentence is concerned solely with "possible theft" or "errors in delivery" caused by acts of Clark's employees. It does not mean that Clark is relieved of responsibility for all losses from theft or all losses from errors in delivery. The cause of the loss in this case was a larceny by trick perpetrated by Segarra and his associates. It was not perpetrated by any act of knavery or stupidity on the part of Clark's employees. The employees were duped by Segarra, and the wrong delivery was an innocent mistake. Although the trial court mentioned the fact that Clark's delivery-clerk had never seen a delivery order naming C & L Trucking and couldn't make out the signature on it, the court did not find negligence on the part of Clark's employees. There was no system of filing and comparing signature cards and Clark's procedure throughout was found to be consistent with that customarily followed by the stevedoring industry. At most Clark's employees failed to detect and prevent the trickery of Segarra, et al. I do not believe, for example, that if a thief broke into Clark's warehouse to steal merchandise and got away with it, because Clark's watchman was at the crucial moment looking the other way, Clark could escape responsibility on the ground that the theft resulted from the watchman's failure to see the thief.
 
 
 32
 The trial court found that Clark mis-delivered the cargo and was liable for it, not because of the limited ability of its employees to detect larceny by trick or for some negligent act on their part, but because of Clark's absolute liability as a bailee unrelieved by any exculpatory clause of the agreement. The decree of the court below is sustaining Cunard's claim of indemnity against Clark should be affirmed.