**ROYAL TYPEWRITER CO., DIVISION LITTON BUSINESS SYSTEMS, INC., Plaintiff,**

v.

**M/V KULMERLAND, her engines, etc., and Hamburg-Amerika Linie, Defendant.**

**HAPAG/LLOYD A. G. (sued herein as Hamburg-Amerika Linie), Defendant and Third-Party Plaintiff,**

v.

**PIONEER TERMINAL CORPORATION et al., Third-Party Defendants.**

**No. 70 Civ. 5424.**

United States District Court, S. D. New York.

July 28, 1972.

Bigham, Englar, Jones & Houston, by F. Herbert Prem, New York City, for plaintiff.

Cichanowicz & Callan, by Michael J. Ryan, New York City, for defendant Hapag/Lloyd A. G.

Thacher, Proffitt, Prizer, Crawley & Wood, by Dwight B. Demeritt, Jr., New York City, for third-party defendant Pioneer Terminal Corp.

Hill, Betts & Nash, by Robert H. Peterson, New York City, for third-party defendant International Terminal Operating Co., Inc.

Mendes & Mount, by Daniel Huttenbrauch, New York City, for third-party defendant Sullivan Security Services, Inc.

TYLER, District Judge.

This is a suit in admiralty[1] to recover damages for the loss of 350 adding machines transported by defendant Hapag/Lloyd A. G. (hereinafter "Lloyd") vessel, the SS KULMERLAND, from Hamburg to the Port of New York. As will be seen, the known facts of the shipment as adduced at trial are relatively simple and, in substantial part, typical of cargo losses in modern times within the Port of New York. Nevertheless, as will also be seen, this case raises, among others, a crucial package limitation issue which can be said to amount to an extension of the similar question discussed and ruled upon in Leather's Best, Inc. v. S.S. Mormaclynx, 313 F.Supp 1373 (E.D.N.Y., 1970), affirmed in part, reversed in part, 451 F.2d 800 (2d Cir. 1971).

## THE PARTIES AND THE PLEADINGS

According to the complaint and the evidence, the plaintiff ordered and paid for a quantity of adding machines manufactured and shipped by rail and ocean carrier by Willi Feiler, G.m.b.H. ("Feiler"), a manufacturing concern in Berlin, West Germany. Plaintiff is a New York corporation and, of course, the ultimate consignee and owner of the cargo which is the subject of this dispute. Defendant and third-party plaintiff, Hapag/Lloyd A. G. ("Lloyd"), is a West German corporation which is the successor to the well-known shipping company, Hamburg-Amerika Linie.

At all times here relevant, third-party defendant Pioneer Terminal Corporation ("Pioneer") was a New York corporation which had a contract with Lloyd to provide terminal and stevedoring services and facilities in connection with loading and discharging vessels of Lloyd in the Port of New York. Pioneer, in turn, had a subcontract with third-party defendant International Terminal Operating Co., Inc. ("ITO"), by the terms of which ITO agreed to furnish certain terminal and stevedoring services and facilities at the now closed terminal at the foot of 17th Street in Brooklyn. Finally, third-party defendant Sullivan Security Services, Inc. ("Sullivan"), also a New York corporation, had a contractual arrangement with ITO to guard and protect cargo at the 17th Street pier complex.

## THE FACTS

Pursuant to order of plaintiff, Feiler, on December 1, 1967, in Berlin, delivered to a truck operated by Kuhne & Nagel, an international freight forwarder acting as Feiler's agent, 350 adding machines. Each machine was within a corrugated cardboard box. In turn, all 350 boxes were loaded by Kuhne & Nagel at its West Berlin warehouse into a single container for railroad transportation from West Berlin to Hamburg and delivery there to Lloyd for ocean transportation.

At the Kuhne & Nagel warehouse, the separate cartons of adding machines were counted and checked upon loading into the container. The container bore the number 7255589 ("the container" or "container 89"). It was loaded into a railway car, the doors of which were sealed. Each carton within the container weighed approximately $12\frac{1}{4}$ pounds; thus, the total container weighed in excess of two tons. The container left by rail from Kuhne & Nagel's Berlin warehouse on December 5, 1967. The doors of the container itself were sealed; oth-

I.  The case was tried on March 30, and April 3 and 20, 1972. Thereafter, extensive briefs were submitted by counsel.

The within opinion, therefore, constitutes the findings and conclusions of the court as required by Rule 52, F.R.Civ.P.

erwise it would not have been accepted by the railway. Parenthetically, but of some importance to note, two other containers each holding 350 adding machines were shipped out by rail at the same time. The three containers, including container 89, which is the subject of this suit, arrived at the Port of Hamburg and received the seals of that port. All three containers were loaded aboard Lloyd's vessel, SS KULMERLAND. At the time of loading, container 89 was checked at least twice for its outward appearance and the condition of its seal. The container was received aboard the vessel without exception being noted. The onboard bill of lading, dated December 9, 1967 in Hamburg, was clean and, of course, acknowledged receipt of container 89. The bill provided for transportation of the container to the Port of New York where it was to be delivered to plaintiff's customs' broker. The hatches of the KULMERLAND were closed and locked during the voyage from Hamburg to New York, and it is not contested that container 89 was stowed below decks in one of the hatches.

The KULMERLAND arrived and started discharging cargo in New York on December 22 and finished on December 30, 1967. There is evidence that container 89 was out-turned on December 30 in apparent good order and condition. Interestingly, the tally sheets covering discharge of the KULMERLAND contain notations of the absence or breaking of seals on several other containers but not so in regard to container 89. There is also evidence that after it came off the KULMERLAND, container 89 was immediately placed in an open (i. e. out-of-doors) "farm area" within the 17th Street pier complex. Almost two weeks later, on January 12, 1968, a watchman employed by Sullivan, while making his rounds, saw that container 89 was broken open with its contents

missing. Sullivan's guard immediately notified his office of what he had found, and reports were made to appropriate law enforcement agencies within the Port of New York. At about the same time, investigation revealed that the two other containers of adding machines consigned to plaintiff were intact and containing their full quotas of 350 cartons per container. There is no substantial dispute but that in the area where container 89 was stowed, there was no guard assigned or stationed, either on a full-time basis or on a regularly scheduled occasional basis.

Parenthetically, the 17th Street terminal has become familiar ground to at least a number of judges of this court in recent years. Although this complex is now closed, during the period relevant to this dispute it was a rather large and busy terminal covering approximately three city blocks, possessing four piers for servicing ocean carriers and including a number of warehouses, other buildings and open or "farm" areas. Although the pier complex was sealed off by fencing, mostly chain-link but partly wood, there were four gates. Two of these gates were either boarded up or locked at all times; the third gate was open on a 24 hour basis and guarded by a gateman or guard at all times. The fourth gate was open from 0800 to 1600 each day. While the latter gate was open, it was also in charge of a gateman or guard.

In December, 1967 and January, 1968, only one guard was assigned to patrol the entire terminal, including the piers, the open or farm areas and the warehouses.[2] Thus, it is not surprising that the one Sullivan guard on duty could not and did not inspect specific cargo pieces or containers to ascertain whether or not they were sealed and unbroken. Indeed, the chief operating officer of Sullivan testified that in his opinion the security personnel assigned

---

2. This guard frequently covered much of his rounds on a "towmotor", a machine which surely was audible (and presumably visible at night because of running lights) to any parties bent on thievery within the terminal.

within the pier complex at the relevant time in question were inadequate. Shortly before the disappearance of plaintiff's container of adding machines, in fact, Sullivan had advised ITO of its view that there were inadequate security measures at the pier complex.[3]

At trial, plaintiff offered evidence of replacement costs of the 350 machines contained in container 89 to be the sum of $28,959.61. Plaintiff also produced evidence indicating, alternatively, that the reasonable market value at New York of the 350 machines would come to $29,400.00. On the other side of the coin, Lloyd has stoutly argued that under the facts of this case and because of the undeniable application of the provisions of the United States Carriage of Goods at Sea Act, 46 U.S.C. § 1300 et seq. ("COGSA"), the familiar "package limitation" of $500 must apply to the container in the event that liability is determined in favor of plaintiff. 46 U.S.C. § 1304(5). Lloyd also argues that plaintiff has failed to prove that the contents of container 89 were lost or stolen during the period of the ocean voyage or when the container was stored at the terminal or pier complex at 17th Street.

## DISCUSSION OF THE ISSUES: ULTIMATE FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. *Liability of Lloyd*

■ Despite Lloyd's denial thereof in its answer, this court clearly has admiralty jurisdiction of plaintiff's claim against Lloyd, 28 U.S.C. § 1333. The complaint alleges a maritime cause of action for breach of an ocean bill of lading. Lloyd as a common carrier clearly provided in its bill of lading issued at Hamburg for underdeck carriage of the container to a United States port. This action was brought *in rem* as to the KULMERLAND and *in personam* as to Lloyd. Thus, Lloyd was responsible, as was its vessel, for safe delivery of container 89 under its Hamburg-issued bill of lading.[4] While this court finds that the loss of the container occurred after it was out-turned on December 30, 1967 and while it was being stored in a farm area of the terminal, the carrier's maritime contract was not at an end. As has been frequently and recently held, the contract continued to govern the relationship between plaintiff and Lloyd after discharge but before delivery of the 350 adding machines to plaintiff or its agent, Leather's Best, Inc. v. S.S. Mormaclynx, *supra*, 451 F.2d at page 807, or, as it is sometimes put, Lloyd became bailee thereof. David Crystal, Inc. v. Cunard S. S. Co., 339 F.2d 295, at 297 (2d Cir. 1964).

■ Aware that plaintiff could prove a prima facie case by showing delivery of the adding machines in apparent good order to the KULMERLAND in Hamburg and the carrier's failure to deliver the goods in New York to plaintiff's agent, Lloyd's first line of defense has been and is that the court should infer from all of the evidence that the adding machines disappeared in West Berlin, or during railroad transit to Hamburg or at pier-side in that port.[5] In my view, no such inference is justified. Rather, the evidence clearly establishes that container 89 arrived intact in New York, was out-turned in good order but its

---

3. It can be argued that representatives of a security company such as Sullivan might naturally be tempted to register such complaints or warnings in order to create a basis for additional personnel and services—i. e. to enhance their business. Recognizing this argument, I nonetheless find that Sullivan's warnings were objectively justified.

4. The bill of lading was claused in English and, by its terms, was subject to the provisions of COGSA. See paragraph 1; see also, paragraphs 16 and 17 which, *inter alia*, have the effect of bringing into play Section 4(5) of COGSA.

5. In this connection, the defense offered expert evidence that container 89 was physically inadequate for transportation of cargo of the nature and weight of the adding machines. This evidence is irrelevant; the container arrived and was unloaded intact.

contents were stolen and surreptitiously removed from the terminal, in all probability one or two days after December 30, 1967. Without further discussion, therefore, I turn to the more substantial issue raised by Lloyd, namely, whether or not the COGSA package limitation of $500 should be applied to container 89 as a whole or to its 350 cartons.

Correctly anticipating that this would be a substantial issue in this controversy, plaintiff's experienced trial counsel has argued extensively that this case falls squarely within the parameters of Chief Judge Friendly's holding and discussion in Leather's Best, Inc., *supra*. Conceding that nothing may be certain in respect to a hardy perennial such as the package limitation question, I nonetheless disagree. The evidence in this case is markedly different from that in *Leather's Best*; hence a different result is suggested, if not required, by the reasoning of the *Leather's Best* opinion.

As already indicated, this is not a case where the carrier, for its own convenience and purposes, stowed the relevant cargo within its own container for shipment aboard the vessel. Rather, container 89 was produced and used by Feiler's agent in Berlin. That container, which in appearance was very similar to a typical general cargo package, was delivered to Lloyd at Hamburg in a sealed condition. Neither the seal nor the container was broken or opened for inspection or any other purpose. None of its markings indicated the number of packages contained therein. The ocean bill of lading (plaintiff's Exhibit 35) issued in Hamburg contains the following interesting and relevant statements and notations:

1. Container 89 is described as "1 Container said to contain machinery . . ."

2. Stamped on the face of the bill is the notation, "Shipper's Load, Stowage and Count"

3. Also typed on the face of the bill is the phrase "shipped onboard and stowed underdeck."

There is no evidence that plaintiff, Feiler, or one of their agents filed a declaration of "higher value" with Lloyd. See paragraphs 16 and 17 of the ocean bill. Similarly, there is no indication that Lloyd was separately informed of the exact contents of container 89. The total ocean freight chargeable for shipment of container 89 was the relatively small sum of $324.

In my view, therefore, this case squarely presents what Chief Judge Friendly described as a "left open" matter in his discussion in Leather's Best, Inc., *supra*, 451 F.2d at page 815. To track his language, " . . . it leaves open, for example, what the result would be if Freudenberg had packed the bales in a container already on its premises and the bill of lading had given no information with respect to the number of bales." Here Feiler, the shipper, through its agent Kuhne & Nagel, packed the adding machines in a container on the agent's premises in West Berlin. Further, the ocean bill recited only "1 Container said to contain Machinery". There was no separate statement or declaration of the actual contents or a "higher valuation" furnished to Lloyd. It can be inferred from the evidence that Feiler for years had been following the practice of loading its packages of adding machines in containers of its own or of a Berlin agent and shipping under similar bills of lading, all to the knowledge of plaintiff or its agent in this case. The physical appearance of container 89 was unlike that of the metal containers so widely used in recent years by ocean carriers; as stated, the container looked like the typical general cargo package. Finally, neither plaintiff nor Willi Feiler could maintain seriously that they were novitiates in the sometimes hard school of ocean transportation rules and practices. Cf. Encyclopaedia Britannica v. S.S. Hong Kong Producer, 422 F.2d 7 (2d Cir. 1969).

Although well aware that the policy or purpose of § 4(5) of COGSA, 46 U.S.C. § 1304(5), is "to set a reasonable figure below which the carrier

should not be permitted to limit liability . . ." (see Friendly, C. J., in Leather's Best, Inc., *supra*, 451 F.2d at page 815), I am mindful that, as Judge Friendly went on to state in the same sentence, a "package" is "thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be 'contained'". *Ibid.* In short, plaintiff's shipper chose the container and used it; it also described the container as heretofore stated. It follows that plaintiff must accept the result, which is a recovery against Lloyd of $500. See generally, Aluminios Pozuelo Ltd. v. S.S. Navigator, 407 F.2d 152 (2d Cir. 1968).

B. *Liability of Third-Party Defendants*

It is assumed that this court has jurisdiction of the third-party claims asserted by Lloyd against Pioneer, ITO and Sullivan, see Leather's Best, Inc., *supra*, 451 F.2d at 802 et seq., either upon diversity of citizenship of the parties to such claims or by virtue of pendent jurisdiction.

■ Before discussing appropriate resolution of the merits of the third-party claims, it is necessary to deal with a post-trial contention of plaintiff that Lloyd having brought in the third-party defendants, "(t)he legal effect . . . is to make them parties to the action" —i. e. to effectively cast Pioneer, ITO and Sullivan as defendants in plaintiff's case. See proposed conclusion of law No. 23 in plaintiff's "Proposed Revised Conclusions of Law"; see, also, The Lysefjord, 263 F. 623 (S.D.N.Y., 1920). Assuming that plaintiff should be al-

lowed to seek amendment of its pleadings at such a late date, I reject any direct claims by plaintiff against ITO, Pioneer and Sullivan because of the obvious jurisdictional obstacles and for other reasons discussed in David Crystal, Inc. v. Cunard S.S. Co., etc., *supra*, 339 F.2d at page 300.[6]

This court has found that container 89 was rifled by unknown thieves operating within the terminal at the foot of 17th Street. Just how the thieves succeeded in removing the adding machines is not established; the two most likely possibilities are that the goods were carried concealed in a vehicle passing through one of the two "open" gates manned by a not overly vigilant guard[7] or that they were removed by stealth through one of the supposedly locked gates or a concealed aperture in the wood fencing. This court has also found that security measures in force at the terminal were plainly inadequate. With these findings in mind, it is appropriate to determine which, if any, of the third-party defendants are liable over to Lloyd.

■ The third-party case against Sullivan needs little elaboration. From what has been said, it is apparent that there was no evidence of negligence on the part of Sullivan's agents or employees. The roving guard, through no fault on his part, was almost certainly in another part of the terminal when container 89 was rifled. It might be speculated that one or more of the Sullivan gate guards was less than vigilant or, worse, in complicity with the thieves; but there is no evidence to this effect. Finally, it was Sullivan which gave specific warnings to ITO of the inadequate security measures at the pier complex.

6. Here it is interesting to note that ITO, Pioneer and Sullivan likely are covered by and thus entitled to invoke the $500 limitation under the terms of paragraph 24 of the ocean bill. See Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, 275 F.Supp. 76 (S.D.N.Y.), aff'd 386 F.2d 839 (2d Cir., 1967), cert. den. 390 U.S. 1013, 88 S.Ct. 1263, 20

L.Ed.2d 162 (1968); Bernard Screen Printing Corp. v. Meyer Line, etc., 328 F.Supp. 288 (S.D.N.Y., 1971), aff'd 464 F.2d 934 (2d Cir., 1972).

7. There is evidence that some vehicles were allowed to pass gates without being logged in or out or recorded by the guard on duty.

Hence, the case must be and is dismissed as against Sullivan.

The claims of Lloyd against ITO and Pioneer present more perplexing questions. To illustrate why this is so, it is necessary to recite certain contractual provisions found in relevant agreements, heretofore mentioned but not discussed, between Lloyd and Pioneer on the one hand and Pioneer and ITO on the other. As of August 1, 1956, Lloyd's predecessor and its agent, United States Navigation Co., Inc., entered into a written agreement with Pioneer as "Contractor", by the terms of which the latter agreed to perform certain terminal services at the 17th Street pier complex. Article I of that contract (Lloyd Ex. K) incorporated by its terms a companion agreement of even date between Pioneer and ITO; specifically, Article I provided:

> "I. *Stevedoring*:
>
> Loading and discharging shall be performed in accordance with and for the rates given in the attached stevedoring contract between Pioneer Terminal Corporation and International Terminal Operating Co., Inc. dated August 1, 1956. Payment for such services shall be made direct to International Terminal Operating Co., Inc."

At trial, Pioneer offered and had received its Exhibit N, a contract dated as of May 2, 1960 between ITO and Pioneer regarding stevedoring and other services at the 17th Street terminal. That agreement contained many of the terms and conditions of the earlier Pioneer-ITO contract of August 1, 1956, including paragraph 8 which is relevant to the third-party claims in discussion:

> "8. Responsibility for Damage or Loss: The Contractor (ITO) will be legally liable for damage to the ship and its equipment, and for damage to cargo, or loss of cargo overside, through its negligence. When such damage occurs to ship or its equipment, or where loss or damage occurs to cargo by reason of such negligence, the Ship's Officers or other authorized representatives will call this to the attention of the Contractor at the time of accident. With respect to claims for loss or damage to cargo and/or baggage, the liability of the Contractor shall be limited to physical damage caused by the negligence of the Contractor and to such claims that result from fraud on the part of employees of the Contractor engaged in the delivery, receiving and watching of cargo." [8]

Although these quoted provisions are obviously taken from documents in effect well before late 1967 and early 1968, it was agreed or assumed by counsel for the parties that these and other provisions remained in effect or were "carried over" by the parties to their relationships at the terminal in the period or years relevant here.

Putting aside the quoted contractual provisions for a moment, it can be reasoned that under New York law, which is controlling here, Pioneer and ITO as agents or subbailees are liable to Lloyd for the lost container valued at $500. See Leather's Best, Inc., *supra*, 451 F.2d at 812–813. Indeed, ITO in particular would be clearly liable upon the express finding that it negligently failed, notwithstanding the warnings from Sullivan, to tighten up security measures at the terminal and upon its contractual commitments directly to Pioneer and indirectly to Lloyd to be responsible for all security arrangements there.[9] Further, it might be argued that as general terminal operator and agent for Lloyd at 17th Street, Pioneer owed Lloyd a non-delegable duty of care with respect to all Lloyd cargo stored at that terminal and must respond in damages when that duty is breached; articulated differently, it could be urged that Pio-

---

8. See same clause appearing in an addendum, dated June 16, 1967, to another Pioneer-ITO contract dated as of April 29, 1960 (Pioneer Ex. O).

9. See Paragraph 1(A)5 of the Pioneer-ITO contract dated April 29, 1960 and "carried over" to the period relevant to this case.

neer must indemnify Lloyd for breach of an implied warranty of workmanlike service. See David Crystal, Inc. v. Cunard S.S. Co., *supra*, 339 F.2d at page 299.

■ But New York law also declares that contract provisions exonerating a party from liability, even for active negligence, may be enforced, absent strong public policy considerations to the contrary. Graves v. Davis, 235 N.Y. 315, 139 N.E. 280 (1923); Ciofalo v. Vic Tanney Gyms, 10 N.Y.2d 294, 220 N.Y.S.2d 962, 177 N.E.2d 925 (1961). The ultimate question, therefore, is whether the contractual provisions heretofore cited are sufficient to exonerate Pioneer and/or ITO. I hold that they are.

■ Quoted paragraph 8 clearly limits ITO's liability in a cargo loss or disappearance to " . . . fraud on the part of employees of (ITO) engaged in the delivery, receiving and watching of cargo." As previously noted, there is no evidence of fraud or complicity in the theft upon the part of ITO's employees or those of its subcontracting agent, Sullivan. Moreover, I read the quoted Article I of the relevant Lloyd-Pioneer contract to mean, among other things, that Lloyd agreed and understood that Pioneer would subcontract to ITO stevedoring and watching services with a clause exonerating ITO from all liability except that based on fraud. Thus, Lloyd cannot recover over against ITO.

Substantially similar reasoning requires that Lloyd's claim over against Pioneer be dismissed. The relevant clauses of the contracts—in particular, aforementioned Article I of the Lloyd-Pioneer agreement—establish that Lloyd accepted and is bound by the terms of Pioneer's agreements with ITO. Thus, Lloyd agreed that ITO was to assume responsibility for, *inter alia*, watching or security services at the terminal with concomitant exoneration of its liability as to and to the extent already discussed. It must be concluded, therefore, that Lloyd by implication. if not expressly,

agreed not to hold Pioneer responsible for cargo losses or damage within the terminal, at least under circumstances analogous to those found in this case. A different result might pertain, perhaps, if there were evidence of active negligence by Pioneer or other conduct on its part which impeded or frustrated ITO's security measures. Without such evidence here, the third-party claim against Pioneer must be and is dismissed.

In summary, plaintiff is entitled to recover $500 for the loss of container 89. The third-party claims of Lloyd against Pioneer, ITO and Sullivan are dismissed. Let judgment be entered accordingly. Counsel are requested to pick up exhibits from chambers.