**EUTECTIC CORPORATION, Plaintiff,**

v.

**M/V GUDMUNDRA, her engines, etc.**

**NORTON LINE et al., Defendants and Third-Party Plaintiffs,**

v.

**INTERNATIONAL TERMINAL OPERATING CO., INC., Third-Party Defendant.**

No. 70 Civ. 5019 (CHT).

United States District Court,
S. D. New York.

Sept. 20, 1973.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; Daniel A. Sullivan, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant and third party plaintiff; M. E. De Orchis, Ara S. Shimshidian, New York City, of counsel.

Hill, Betts & Nash, New York City, for third party defendant; Robert W. Mullen, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is a suit by Eutectic Corporation (a New York corporation) ("Eutectic") against defendant shipowner Norton Line ("Norton") [1] to recover for the loss of a complete shipment of 93 cases of nickel core wire carried aboard the M/V Gudmundra from Santos, Brazil in August 1969, and discharged at the port of New York. The shipowner, Norton, impleaded its stevedore/terminal operator, International Terminal Operating Co., Inc. ("International"), seeking indemnity for any liability to Eutectic resulting from the loss, together with counsel fees and expenses.

By stipulation of all parties at the commencement of the trial, plaintiff Eutectic agreed that its damages would be fixed in the amount of $38,000 and that this sum would be payable to it from either the defendant shipowner Norton or the third-party defendant stevedore/terminal operator International.

## FINDINGS OF FACT

1. On July 30, 1969, the M/V Gudmundra arrived at Santos, Brazil, its last port of loading in South America, before sailing for ports on the east coast of the United States.

2. On July 31, 1969, the 93 cases of nickel core wire were loaded aboard the vessel in the No. 4 upper 'tween deck. The 93 cases were "tallied" on board at the time of loading (TPP Exh. 6) [2] and a short form bill of lading, incorporating the provisions of the long form bill of lading and indicating Eutectic as consignee was issued by Norton (TPP Exh. 5). The Chief Mate also issued a receipt for the 93 cases (TPP Exh. 7). The vessel's manifest listed them as aboard as did the stowage plan (TPP Exh. 8, 9). The wire was packed in wooden cases approximately 2' x 1' x 10" and the 93 cases had a total weight of 22,550 pounds (TT at 53,[3] TPP Exh. 5). No other shipments of cases of nickel core wire were loaded aboard the vessel for discharge at ports on the east coast of the United States. Most of the cargo loaded at the South American ports consisted of bags of coffee and cartons of corned beef.

3. The vessel sailed from Santos on August 1, 1969 and arrived at Jacksonville, Florida on August 15, 1969 where she discharged bags of coffee and cartons of corned beef. She departed for New York on August 16, 1969 and arrived at New York on August 19, 1969 (TTP Exh. 2, at 12).

4. Before the vessel arrived at New York, International was furnished with a copy of the ship's manifest (TPP Exh. 8), which showed both the marks on the cases and exactly the number of cases

---

1. Norton Line is the trade name of the shipowner, Rederi A/B Fredrika (a Swedish corporation), and Norton, Lilly & Co., Inc. is the latter's agent.

2. The initials "TPP" refer to "Third-Party Plaintiff".

3. The initials "TT" refer to "Trial Transcript".

to be discharged by the stevedore, and a copy of the stowage plan (TPP Exh. 9), which showed where the cases were stowed (TPP Exh. 3, at 14–15, 20, 28–30). International prepared from the manifest a sorting sheet listing all the New York cargo to be discharged, including the cases of wire in question (TPP Exh. 3, at 11–13).

5. Under the terms of a written agreement between Norton and International (TPP Exh. 10, ¶ 3), International was to supply complete terminal services, including labor for clerking, checking, watching and delivering. International also agreed to break out of stow, discharge, place and tier cargoes on its pier (id., ¶ 4), to sort all cargo according to the manifest and bills of lading (id., ¶ 5(c)), to maintain all delivery records (id., ¶ 3), and to provide sufficient personnel to perform the work, including watching service (id., ¶ 5(b)).

6. The vessel docked at Pier 21, New York, on Tuesday, August 19, 1969, and by Thursday, August 21, 1969, at 6:45 P.M., she had discharged her New York cargo and sailed on the latter date at 7:40 P.M. (TPP Exh. 2, at 12–15). No tally was made of the cases of wire (TT at 26). However, the vessel's delivery receipt, prepared by International, lists 93 cases of nickel core wire consigned to Eutectic as received in good order from on board the M/V Gudmundra but never delivered to the consignee, with the notation "Not Found" (TPP Exh. 11, TT at 23–24). At no time prior to the departure of the vessel did International or anybody else report any shortage to the vessel (TT at 47–48).

7. The cases were first placed in a locked crib in warehouse B at Pier 21. Such a crib is the safest place at the pier (TT at 42). However, some time prior to Friday, August 29, 1969, the consignee called for the cases and they were taken out of the crib and placed in an open "farm" in front of the delivery office. The consignee did not have the proper papers and, therefore, delivery

was not made. The cases, however, were not returned to the crib. Rather, they remained in Warehouse Shed A "shortline" where small cases are received or delivered (TT at 42–46, TPP Exh. 2, at 95–96). The cases were last seen in this area at 4:20 P.M. on Friday, August 29, 1969. The terminal was closed over the Labor Day weekend and pier operations resumed on Tuesday, September 2, 1969, at which time it was discovered that the cases were missing. (TPD Exh. A and D).[4]

8. Although Pier 21 was officially closed for the holiday weekend at 11:00 P.M. on Friday, August 29, 1969, longshoremen were assigned to continue loading M/V Gudmundra (on a subsequent voyage) until 2:10 A.M., Saturday, August 30, 1969 (TPD Exh. D).

9. When the loss was discovered, the M/V Gudmundra was searched at the port of Savannah, Georgia to investigate the possibility that the cases might have been reloaded aboard the vessel in error. The cases, however, were not found.

10. Approximately 18 to 20 guards were normally on duty on Pier 21. However, on Sunday, August 31 and Monday, Labor Day, September 1, 1969 the coverage was reduced to 6 men.

11. International hired the delivery clerks, checkers, guards and stevedores and handled all cargo discharged by Norton at Pier 21.

12. The bill of lading relating to the 93 cases (TPP Exh. 5) provided, *inter alia*, that:

"2.   *   *   *

There shall not be any inference of negligence or unseaworthiness or lack of due diligence from the fact, nature or extent of loss or damage.

   *   *   *   *   *   *
"24.   *   *   *

In any event, the Carrier [Norton] and the ship shall be discharged from all liability for any loss of, or damage to . . . the goods . . . unless suit is brought within one year

---

4. The initials "TPD" refer to "Third Party Defendant".

after delivery of the goods or the date when the goods should have been delivered."

14. Norton's P & I Club extended Eutectic's suit time to November 19, 1970. Suit was instituted on November 16, 1970.

## CONCLUSIONS OF LAW

■ 1. Eutectic's claim against Norton and the vessel for failure to deliver the 93 cases of nickel core wire is properly within federal admiralty jurisdiction. Leather's Best. Inc. v. S.S. Mormaclynx, 451 F.2d 800, 807 (2d Cir. 1971); David Crystal, Inc. v. Cunard S.S. Co., 339 F.2d 295, 297 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965).

■ 2. Norton's claim against International for breach of contract to properly discharge, count, care for and deliver Eutectic's cargo is within the diversity and/or pendent jurisdiction of this court. Royal Typewriter Co., Division of Litton Business Systems, Inc. v. M/V Kulmerland, 346 F.Supp. 1019, 1025 (S.D.N.Y.1972), aff'd 483 F.2d 645 (2d Cir. 1973).

■ 3. Eutectic was the owner of the lost goods and is the proper party to bring this action.

■ 4. The standard for determining Norton's liability to Eutectic is a matter of federal law.

5. By the overwhelming weight of the evidence, all 93 cases were delivered into the possession and control of International. Such evidence includes the bills of lading (46 U.S.C. § 1303(4) (1970)); the tally made and the mate's receipt given at Santos, Brazil; the ship's manifest; the sorting sheet prepared by International from the manifest; the delivery receipt prepared by International; the testimony of witness placing at least some of the cases on the pier in the custody and control of International; and the failure of anyone to make any claim of shortage prior to the loss of the entire cargo. The fact that no tally was made at the time of discharge is not determinative. Middle East Export Co. v. Concordia Line, 64 Misc.2d 270, 314 N.Y.S.2d 390 (N.Y.C. Civ.Ct. 1970), aff'd, 71 Misc.2d 365, 336 N.Y.S.2d 217 (Sup.Ct.App.Term, 1st Dept.1972).

■ 6. The loss having occurred after discharge, the Carriage of Goods by Sea Act ("COGSA") is not applicable, since it applies "from the time when the goods are loaded on to the time they are discharged from the ship." 46 U.S.C. § 1301(e) (1970). Under COGSA, the liability of the carrier prior to loading and after discharge is made subject to the Harter Act. 46 U.S.C. § 1311 (1970).

■■ 7. Under the Harter Act, 46 U.S.C. §§ 190 et seq. (1970), the carrier (Norton) is responsible to make "proper delivery of any and all lawful merchandise or property committed to its or their charge." 46 U.S.C. § 190 (1970). Failure to deliver cargo renders the carrier (Norton) liable to Eutectic. The carrier (Norton) employed International to fulfill its obligation to discharge and deliver Eutectic's cargo. International had custody and possession of the cargo as a bailee when the loss occurred. It had the obligation to account properly for all the cargo being discharged from the carrier (Norton) at New York and to deliver same to the consignees or their agents in accordance with the bill of lading. Schnitzer Steel Products Co. v. American President Lines, 1972 A.M.C. 2617 (N.Y.Sup.Ct.1972); A. C. Israel Commodity Co. v. Lavino Shipping Co., 1968 A.M.C. 139 (E.D.Pa.1967), aff'd sub nom. A. C. Israel Commodity Co. v. American-West African Line Inc., 397 F.2d 170 (3d Cir.), cert. denied, 393 U.S. 978, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968); Middle East Export Co. v. Concordia Line, *supra*, 64 Misc.2d 270, 314 N.Y.S.2d 390; Sperry Rand Corporation v. Norddeutscher Lloyd, et al., 68 Civ. 5040 (S.D.N.Y. June 20, 1973). Accordingly, defendant carrier (Norton) is liable to Eutectic for the failure of International to account for the missing 93 cases.

8. The discharge and delivery operation of cargoes at Pier 21 was controlled exclusively by International which was under an obligation to perform its duties in a workmanlike manner in accordance with the warranty implied by law. Failure to account for the missing cases is a breach of such warranty of workmanlike service. David Crystal, Inc. v. Cunard S.S. Co., *supra*, 339 F.2d at 299. This rule applies even where a stevedore has contracted with a carrier to be liable only for negligence, absent an express disclaimer of the implied warranty. Pettus v. Grace Line, Inc., 305 F.2d 151, 155 (2d Cir. 1962).

9. Such implied warranty does not impose the obligation of an insurer upon the party giving the warranty. Liability must be based on the ordinary tort standard of negligence. Sperry Rand Corporation v. Norddeutscher Lloyd, et al., *supra*, 68 Civ. 5040 at 12–13; Union Marine & General Ins. Co. v. American Export Lines, Inc., 274 F.Supp. 123, 128 (S.D.N.Y.1966).

10. International was negligent in failing to return the 93 cases to the locked crib in Warehouse Shed B and in leaving them in the "shortline" area in Warehouse Shed A during a period when the normal complement of guards had been reduced by two-thirds. For 93 cases having a total weight of 22,550 pounds to have disappeared without trace, they "must have been taken either through an unguarded, 'locked' gate or through a guarded gate while the guards were not vigilant . . . ." Sperry Rand Corporation v. Norddeutscher Lloyd, et al., *supra*, 68 Civ. 5040 at 14.

11. Norton, in extending Eutectic's time to sue, did not waive its indemnity claim against international. Mitsui & Co. (U.S.A.) v. Toko Kaium Kabushiki Kaisha, 342 F.Supp. 14, 19 (S.D.Tex.1972); Middle East Export Co. v. Concordia Line, *supra*, 64 Misc.2d 270, 314 N.Y.S.2d 390.

12. In accordance with the issue presented to the Court by stipulation of the parties, the Court finds that International is liable to Eutectic and that Eutectic is entitled to judgment in the amount of $38,000 against International.

13. Full indemnity for Norton entitles it to collect reasonable counsel fees and expenses from International, and accordingly, Norton shall have judgment for fees and expenses relating to the defense of Eutectic's case. A. C. Israel Commodity Co. v. American-West African Line Inc., *supra*, 397 F.2d at 171–172; David Crystal Inc. v. Cunard S.S. Co., *supra*, 339 F.2d 295; Middle East Export Co. v. Concordia Line, *supra*, 64 Misc.2d 270, 314 N.Y.S.2d 390; Paliaga v. Luckenback S.S. Co., 301 F.2d 403 (2d Cir. 1962).

14. Counsel will submit judgments in accordance with this opinion within ten (10) days of its filing.