[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 24, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-14858
_____

D.C. Docket No. 94-06124-CV-NCR


GROUPE CHEGARAY/V. DE CHALUS,
a foreign corporation,

                                                            Plaintiff-Appellee,


      versus


P & O CONTAINERS a foreign corporation,
SEA-LAND SERVICE, INC., a corporation,


                                                            Defendants-Cross-
                                                            claimants-Appellants,


WELLS FARGO GUARD SERVICE, INC. OF
FLORIDA, a corporation,

                                                            Defendant-Cross-
                                                            defendant.


_____


Appeal  from the United States District Court
for the Southern District of Florida

_____
**(May 24, 2001)**

Before ANDERSON, Chief Judge, CARNES and OAKES[*],  Circuit Judges.

OAKES, Circuit Judge:

This case involves an eight-ton, 40-foot container filled with perfumes and cosmetics shipped from France to Florida that mysteriously disappeared while in a marine terminal at Port Everglades, Florida.  The cargo insurer brought a subrogation action against the carrier, the port terminal operator, and the port security provider.  The carrier and the terminal operator each brought cross-claims against the security provider for indemnity and contribution.

In resolving this dispute, this Court once again navigates through the muddy waters of determining the meaning of "package" under § 1304(5) of the Carriage of Goods by Sea Act ("COGSA" or the "Act"), 46 U.S.C. § 1300 et seq. (2000). Subsection 1304(5)[1] limits carrier liability to $500 "per package," but fails to define the term "package."  In this case, the district court deemed each of the 2,270

---

[*]Honorable James L. Oakes, U.S. Circuit Judge for the Second Circuit, sitting by designation.

[1]Subsection 1304(5) provides in pertinent part:

Amount of liability; valuation of cargo
(5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . or in case of goods not shipped in packages, per customary freight unit . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. . . .  In no event shall the carrier be liable for more than the amount of damage actually sustained.

cartons, all but two of which were wrapped onto a total of 42 pallets, a "package" for purposes of § 1304(5) liability. The court also dismissed both plaintiff-appellee's claims and appellants' cross-claims against the security provider.

On appeal, the carrier and port terminal operator argue (1) that the district court erred in ruling that the package limitation applied to the 2,270 cartons instead of to either the one sealed container or, in the alternative, to the 42 pallets plus two cartons; (2) that the district court erred in dismissing the insurer's claim against the security provider; and (3) that the district court erred in denying the carrier and port terminal operator indemnity from the security provider. We affirm in part and reverse in part.

BACKGROUND

Parbel Inc. is a Florida company that imports *L'Oreal* products from France. In 1992, Parbel ordered a shipment consisting of four containers from Parfums Et Beaute International Et Cie ("Parfums"), which shipped the order on the Nedlloyd Holland, a ship operated by P&O Containers, Ltd. ("P&O"). P&O contracted to deliver the shipment from LeHavre, France, to Parbel's warehouse in Miami, Florida. After the Nedlloyd Holland arrived at Port Everglades in Ft. Lauderdale, Florida, the containers were off-loaded from the ship and stored in a container yard operated by Sea-Land Service, Inc. ("Sea-Land") until delivery to the consignee in

3

Miami. Sometime between December 26 and December 28, 1992, one of the containers mysteriously disappeared.

The perfumes and cosmetics in the missing container were packed into a total of 2,270 shoebox-sized corrugated cardboard cartons. These small cartons were then consolidated into 42 larger units, which were bound together with plastic wrap and packed onto 42 pallets, with two cartons remaining.

Groupe Chegaray/V. De Chalus ("Groupe Chegaray"),[2] Parbel's subrogated insurer, paid for the loss under a cargo insurance policy and brought a subrogation action against P&O and Sea-Land (together, "appellants"), as well as Wells Fargo Guard Service, Inc. ("Wells Fargo"). The district court found in an omnibus summary judgment order that the number of packages under COGSA § 1304(5) was 2,270 and that appellants were jointly and severally liable for Groupe Chegaray's damages up to $1,134,000.[3] After a bench trial, the court also dismissed both Groupe Chegaray's and appellants' claims against Wells Fargo.

DISCUSSION

---

[2]The originally named plaintiff in this case, Zurich Compagnie D'Assurances, S.A., changed its name to Groupe Chegaray during the course of the lower proceedings.

[3]Subsection 1304(5) erects a limitation to liability; it does not determine actual liability. In its order of final judgment, the district court found the shipper's actual damages, and thus appellants' liability, to be $505,190.40, plus pre- and post-judgment interest.

We note at the outset that we review a grant of summary judgment de novo and the district court's findings of fact for clear error. See Levinson v. Reliance Std. Life Ins. Co., 245 F.3d 1321, 1324 No. 00-11187, (11th Cir. 2001).

I.    COGSA Claims

COGSA's lineage dates back to 1893 with the Harter Act, which was relied upon by the Hague Rules in 1921, which were in turn adopted at the International Convention for the Unification of Certain Rules Relating to Bills of Lading at the Brussels Convention of 1924. See Laurence B. Alexander, Comment, Containerization, the Per Package Limitation, and the Concept of "Fair Opportunity," 11 Mar. Law. 123, 125-26 (1987). In 1936, Congress adopted the language of COGSA almost in its entirety. See Monica Textile Corp. v. S.S. Tana, 952 F.2d 636, 638 (2d Cir. 1991) (citing Robert C. Herd & Co. v. Krawill Mach. Corp., 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959)); Spartus Corp. v. S/S Yafo, 590 F.2d 1310, 1315-16 (5th Cir. 1979). Congress did change liability under § 1304(5) in one significant respect, however. The international rules limit liability "per package or unit," whereas § 1304(5) limits it "per package . . . or in the case of goods not shipped in packages, per customary freight unit[.]" See Hartford Fire Ins. Co. v. Pacific Far East Line, Inc., 491 F.2d 960, 962 (9th Cir. 1974). Arguably, this change underscores the emphasis that Congress placed

5

on the "package" as the elemental unit of liability for § 1304(5) purposes. Despite this emphasis, Congress neither defined the term in the statute nor left behind any legislative history to help courts do so. See id. at 963; see also Monica Textile, 952 F.2d at 638.

In addition to the lack of statutory guidance, unforeseeable technological strides in the shipping industry since 1936 have contributed to the frustration of many courts attempting to define a COGSA package. Traditionally, shipments were made by "breakbulk," whereby goods were packaged into parcels which could be hand-loaded into a vessel's cargo-hold. See Nancy A. Sharp, Comment, What is a COGSA "Package?", 5 Pace Int'l L. Rev. 115, 117-18 (1993). The advent of the container in the 1960s revolutionized the shipping industry by enabling the shipment of massive metal boxes filled with goods that were often concealed and/or not divided into breakbulk size. See id. Modern containers are able to hold hundreds of "packages" as the term was probably understood in 1936. The very concept of a cargo-hold was transformed when vessels were retrofitted to hold containers, which functionally became part of the ship itself. See Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 815 (2d Cir. 1971); Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d 807, 816 (2d Cir. 1981). Thus, if ever the meaning of a "package" was self-evident, the container turned it into a

6

puzzle.[4]  And, of course, there remains consideration of the decrease in the value of the dollar between 1936, when COGSA set the $500 amount, and the present.

Moreover, while it is generally understood that COGSA's liability limitation was originally enacted in order "to restrain the superior bargaining power wielded by carriers over shippers[,]" Vegas v. Compania Anonima Venezolana De Navegacion, 720 F.2d 629, 630 (11th Cir. 1983) (per curiam), the bulk of modern litigation under § 1304(5) consists of subrogation actions because cargo shippers, instead of paying increased freight by declaring the value of what is shipped, buy insurance from cargo insurers.  See Nichimen 462 F.2d at 335 (2d Cir. 1972); Leather's Best, 451 F.2d at 815.  As the Second Circuit remarked in Nichimen, "Most cargo damage actions are really battles between insurers . . . and there is

_____

[4]For example, the Second Circuit, which has had the most experience applying § 1304(5), has struggled to find one definitive approach.  See, e.g., Mitsui, 636 F.2d at 818-21 (abandoning functional economics test and holding that when bill of lading discloses on its face contents of container, then contents, not container, are COGSA packages); Royal Typewriter Co. v. M/V Kulmerland, 483 F.2d 645, 648-49 (2d Cir. 1973) (introducing "functional economics test," creating presumption that when shipper's own packaging units are functional, those units are COGSA packages but when units could not themselves be shipped feasibly overseas, then container is COGSA package); Nichimen Co. v. M.V. Farland, 462 F.2d 319, 335 (2d. Cir. 1972) (stating that COGSA "package" provision has "become unsatisfactory . . . but, pending a new resolution, courts do best to apply it in light of the parties' probable intention[]"); Leather's Best, 451 F.2d at 815 (reasoning from congressional intent); Standard Electrica, S. A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, 375 F.2d 943, 945 (2d Cir. 1967) (holding that a package is "a unit that would be fairly uniform and predictable in size, and one that would provide a common sense standard") (footnote omitted); see generally Andrea R. Luciano, Much Ado About Packages: Containers and the COGSA Limitation of Liability Provision, 48 Brook. L. Rev. 721 (1982).

7

thus no need for shedding crocodile tears on behalf of the shipper or consignee."
462 F.2d at 335.

In this case, Parbel chose to buy full value insurance coverage and to under-declare the value of its shipment, thereby obtaining the lowest freight rate. By doing so, Parbel paid approximately $19,000 less in freight than it would have paid had it declared the containers' actual value. Appellants argue that because Parbel protected itself by obtaining insurance coverage, we should resolve any ambiguities in the contract against Parbel and its subrogated insurer. While it is true that shippers have a choice when declaring the value of their shipments and that insurers assume the risk associated with their services, appellants' argument begs the inescapable statutory question presented by § 1304(5), which we now address.

A.    Application of COGSA *Ex Proprio Vigore*

Appellants argue that because the container was lost after it was discharged from the Nedlloyd Holland, COGSA does not apply ex proprio vigore to the facts of this case, but only as a contract term. In support of their argument, they cite to COGSA § 1301(e), which defines "carriage of goods" to cover the period of time when the goods are loaded onto the ship to when they are discharged from the ship. Accordingly, appellants argue that the trial court erred in applying the legal

8

definition of "package" under COGSA and that, instead, the court should have applied the principles of contract interpretation to determine the meaning that the parties intended to assign to the term "package."

We disagree and find that the bill of lading is fully subject to the provisions of COGSA. We arrive at this conclusion for two independent reasons. First, Clause 26(1) of P&O's bill of lading explicitly incorporates COGSA as "paramount throughout" the time the goods are in the custody of P&O or its subcontractor at the sea terminal and until they are delivered to the consignee in Miami.[5] Second, appellants explicitly stipulated the application of COGSA to the facts of this case in their March 1998 pre-trial stipulation,[6] as well as in each of

---

[5]Clause 26(1) of P&O's bill of lading states, in pertinent part:
[T]his Bill of Lading shall be subject to [COGSA], the terms of which are incorporated herein and shall be paramount throughout Carriaged [sic] by sea and the entire time that the Goods are in the actual custody of the Carrier or his sub-contractor at the sea terminal in the United States of America before loading onto the vessel or after discharge therefrom, as the case may be. As thus applied other than at sea, US COGSA is applied to determine the liability of the Carrier who shall be entitled to the benefits of the defences [sic] and limitations therein, notwithstanding that loss did not occur at sea.

[6]In the parties' pre-trial stipulation on March 20, 1998, P&O stipulated that "[t]he terms and conditions of P&O Combined Transport Bill of Lading TFEI HOL 255 500828 incorporate the United States Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., to apply before loading and after discharge of the cargo." **[R5-124-11, sec. VII, p.2]**

their April 1995 motions for partial summary judgment as to the liability limitation under § 1304(5).[7]

B.    Discrepancy Between Shipper's and Carrier's Bill of Lading

In order to determine what constitutes the COGSA package, we begin by looking at the bill of lading. See Hayes-Leger Assocs., Inc. v. M/V Oriental Knight, 765 F.2d 1076, 1080 (11th Cir. 1985) (quoting Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam", 759 F.2d 1006, 1012 (2d Cir. 1985). Here, P&O altered the pro-forma bill of lading that Parbel's shipping agent, Ocetra, submitted to P&O along with the containers. Specifically, what Ocetra's pro-forma bill of lading refers to as "pallets," the rider to P&O's ON BOARD bill of lading refers to as "packages." The question is whether P&O's bill of lading is enforceable as to the description of the pallets as "packages." We believe that it is.

P&O's ON BOARD bill of lading states:

MARKS AND NUMBERS     NO. OF PKGS.     DESCRIPTION OF PACKAGES AND GOODS

---

[7]In each of their individual motions for partial summary judgment, P&O and Sea-Land argued against applying § 1301(e)-- although they now argue for it-- and stated that:
>    [A]n ocean carrier can contractually extend the application of COGSA from the time after discharge from the ocean vessel to the time of actual or constructive delivery . . . . Clause 26 of the P&O bill of lading incorporates COGSA to be paramount throughout the entire time that the goods are in the actual custody of the carrier or its subcontractor at the sea terminal after discharge from the vessel. . . . .[T]he loss occurred prior to delivery to the consignee and at a time when the bill of lading continued to govern the rights and obligations of the parties. . .one of which was the right of P&O to limit its liability. . .pursuant to Section 1304(5) of COGSA[.]" **[R1-39, 40]**

```
CONTAINERS:    4           UNITS
                           138 PACKAGES COSMETICS
                           AS DETAILED ON THE ATTACHED
RIDER
```

The rider describes the missing container as follows:

```
1      40' DRY VAN S.T.C. [said to contain]
        31 PACKAGES NOS. 43/73    ORDER 70187x COSMETICS
        11 PACKAGES + 2 CTNS ORDER 70188A COSMETICS
----            ---UNIT TOTALS---            --------
        42 PACKAGES STC 2268 CARTONS + 2 CTNS
```

Ocetra's pro-forma bill of lading is almost identical to P&O's rider, except that "packages" are described in Ocetra's bill of lading as "pallets."

Groupe Chegaray argues that we should not accept P&O's revised bill of lading as the manifestation of the parties' contract because by the time the shipper received a copy of the revision, the goods were already aboard the Nedlloyd Holland, thus giving the shipper no means by which to reject the change. Groupe Chegaray also contends that the revision violated COGSA § 1303(3), which requires, in certain circumstances, that carriers issue bills of lading reflecting the shipper's stated representations of the number of shipped packages. Appellants maintain that it is not only customary for a carrier to issue the final bill of lading, but that, in this case, Ocetra had specifically requested a "CLEAN ON BOARD"

bill of lading and voiced no objection when it received the final bill of lading with the altered language.

It is remarkable that after so many decades and dollars spent litigating the package liability limitation clause under § 1304(5), the shipping industry has not yet settled upon a sound strategy for protecting both parties' interests. While courts have struggled to modernize the language of § 1304(5), the industry seems to have neglected to do its part. Appellants protest that they are helpless to demand a clear and explicit statement from shippers as to the number of COGSA packages, even though it presumably would enable them to calculate an appropriate surcharge. They claim that charging freight according to the number of declared COGSA packages is not feasible because the fixed industry custom is to charge freight by weight and declared excess value. While we are ill-suited to argue with over one hundred years of shipping expertise, we remain confounded by the inefficiencies exemplified in this case. Carriers seem unable to protect their interests and, the law clearly being in their favor, shippers seem to have grown too complacent to make their interests explicit.

Fault, nevertheless, does not fall on the parties alone. COGSA § 1304(5) operates by law and, while the parties' intent is a factor, it is not determinative of the meaning of "package" under the statute. Perhaps, as the Second Circuit noted

12

decades ago regarding § 1304(5), "this area is one . . . in which the search for predictability and avoidance of litigation will go on regardless of what we may do . . . . Until there is a legislative solution. . .the courts will have to deal with the cases as they arise." Cameco, Inc. v. S.S. American Legion, 514 F.2d 1291, 1300 (1974), overruled in part by Mitsui, 636 F.2d at 819-21.

Groupe Chegaray cites to Belize Trading, Ltd. v. Sun Insurance Co., 993 F.2d 790 (11th Cir. 1993), to support its argument that the description in Ocetra's pro-forma bill of lading is controlling. In Belize Trading, the carrier issued a bill of lading listing only the number of containers under the "Description of Packages and Goods" column, even though the shipper had submitted a packing list indicating the number of cartons within each container. See id. at 791. The district court held that the carrier's bill of lading was controlling for § 1304(5) purposes, but this Court reversed, stating that the carrier's descriptions were "unilateral and self-serving" rather than accurate. See id. at 792.

The Belize Trading Court based its decision on two grounds. First, although the court acknowledged that it is customary in the shipping industry for carriers to issue bills of lading upon stowing the cargo aboard the vessels, the carrier in Belize Trading had not issued its revised bills of lading until "after the [vessel] had left port and part of its cargo . . . had been lost at sea[.]" 993 F.2d at 791. For this

13

reason, the court found that the shippers never actually accepted the carrier's bills of lading and, thus, those bills of lading were unenforceable.  See id. at 792.  Second, the court noted that the carrier's bills of lading fell afoul of COGSA § 1303(3).[8]  See id.

The facts in this case are quite different from those in Belize Trading.  Here, the cargo was not loaded aboard the Nedlloyd Holland until December 14, when P&O issued its bill of lading.[9]  Ocetra received P&O's revised bill of lading when the cargo was put aboard the contracted ship, as is required for CLEAN ON BOARD bills of lading.  Ocetra was anticipating receipt of an ON BOARD bill of lading from P&O.  In fact, it had demanded it.  Clearly, Ocetra could not have believed that its pro-forma bill of lading represented the final manifestation of the parties' contract.  When Ocetra did receive P&O's bill of lading, it voiced

---

[8]Subsection 1303(3) provides in part:
After receiving the goods into his charge the carrier . . . shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things–
. . . .
(b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.
(c) . . . Provided, That no carrier . . . shall be bound to state or show in the bill of lading any marks, number, quantity, or weight . . . which he has had no reasonable means of checking.
46 U.S.C. 1303 (2000).

[9]The containers were surrendered to P&O on December 10, loaded onto a feeder vessel on December 12, and loaded onto the Nedlloyd Holland headed for Florida on December 14.  P&O's bill of lading is dated December 14.

14

absolutely no objection to the changed language. Indeed, Ocetra conceded to the changed language through its silence and inaction coupled with the parties' expectation that P&O would be issuing a final bill of lading. Although the record is unclear whether Ocetra could have retrieved its containers before the Nedlloyd Holland set sail, at the very least it could have registered opposition. Appellee is estopped from now claiming that the revision was unacceptable to the shipper at the time. See Mitsui, 636 F.2d at 823.

Moreover, unlike in Belize Trading, this is not a case in which the carrier erased altogether any mention of the number of cartons from its final bill of lading. Rather, P&O preserved and detailed all of the relevant information that Ocetra had submitted, including the number of cartons contained in the pallets. And, in light of Ocetra's failure to furnish a proper "Description of Packages," it was perfectly reasonable for P&O to interpret a "pallet" as a "package."[10]

Finally, we believe that P&O did not violate § 1303(3) because it was not under an obligation to list the number of cartons in the bill of lading. Under § 1303(3)(c), a carrier is not bound to state upon its bill of lading any quantity which

_____

[10]There is some record evidence that the words "pallet" and "package" were used interchangeably, including that "palettes" were referred to in the shipper's packing slip, as "colis," which is the French word for "package." See Standard Electrica, 375 F.2d at 946 (noting that considerations outside of the four corners of the bill of lading "are entitled to considerable weight" in determining the parties' understanding of what constitutes a "package" for shipping purposes).

15

it "has had no reasonable means of checking." Because the cartons were packaged together in 42 bundles-- not to mention the fact that the pallets were themselves sealed away within the containers-- there was no reasonable way for P&O to check that the number of cartons Ocetra listed on its pro-forma bill of lading was in fact the actual number of cartons bound together upon the 42 pallets.

In this case, the district court accepted P&O's bill of lading as the manifestation of the parties' contract. See Zurich Int'l France v. P&O Containers Ltd., 99 F. Supp. 2d 1354, 1356 (S.D. Fla. 1999). As mentioned above, we believe that the district court was correct in so doing. We now proceed to review the court's analysis of the package liability issue under the terms of the final bill of lading.

C.    Number of COGSA Packages

Appellants argue that the number of COGSA packages is four because "4" is listed in the bill of lading under the heading "NO. OF PKGS." In the alternative, they argue that the 42 pallets plus two cartons are the COGSA packages because they are described as such in the bill of lading. Groupe Chegaray, on the other hand, contends that because the bill of lading is ambiguous regarding the number of COGSA packages, we are required to resolve the ambiguity in their favor and affirm the district court's finding that the 2,270 cartons constitute the COGSA

16

packages. We believe that the 42 pallets, described as "packages" in the bill of lading, plus the two cartons, represent the accurate number of COGSA packages.

In this Circuit, "we approach any attempt to define a container as a COGSA package with great reluctance. Moreover, our inquiry into the matter does not end . . . at a quick glance at the 'number of packages' column on the bill of lading." Fishman & Tobin, Inc. v. Tropical Shipping & Constr. Co., 240 F.3d 956, 964 (11th Cir. 2001) (footnote omitted); see also Monica Textile, 952 F.2d at 641 (noting that courts "have consistently cast a jaundiced eye" upon agreements that containers be COGSA packages).

Even if we were not reluctant to take the container as the package, appellants' principal argument does not withstand analysis under Hayes-Leger, supra, the case which sets out the two basic rules in this Circuit for determining the number of COGSA packages in container cases :

> (1) when a bill of lading discloses the number of COGSA packages in a container, the liability limitation of section 4(5) applies to those packages; but (2) when a bill of lading lists the number of containers as the number of packages, and fails to disclose the number of COGSA packages within each container, the liability limitation of section 4(5) applies to the containers themselves.

Id. at 1080. Because neither the statute nor its legislative history is particularly helpful in defining a COGSA package, this Court has adopted a family of principles for the task. We begin by assuming "that Congress intended to vest the

17

word with its plain, ordinary meaning." <u>Vegas</u>, 720 F.2d at 631. In <u>Hayes-Leger</u>, we elaborated upon this assumption by endorsing the Second Circuit's definition of a COGSA package in <u>Aluminios Pozuelo, Ltd. v. S.S. Navigator</u> as "a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." 407 F.2d 152, 155 (2d Cir. 1968); <u>Hayes-Leger</u>, 765 F.2d at 1082 ("the proper definition of a COGSA 'package' is the one stated in the <u>Aluminios Pozuelo Ltd.</u> case"). More recently, in <u>Fishman & Tobin</u>, we listed four additional principles to determine a COGSA package: (1) the court should look to the parties' contractual agreement in the bill of lading; (2) a COGSA package is the result of some amount of preparation for the purpose of transportation, which also facilitates handling; (3) a container can be considered a COGSA package only in light of a clear agreement to that effect; and (4) when goods are placed in containers without being described as separately packaged, they are classified as "goods not shipped in packages" for COGSA purposes, absent an agreement otherwise. <u>See</u> 240 F.3d at 960. Finally, when a bill of lading is ambiguous regarding what constitutes the COGSA package, then, in light of the widely accepted understanding that the original purpose of § 1304(5) was to protect shippers against carriers, the ambiguity is resolved against the

18

carrier.  See Sony Magnetic Prods. Inc. v. Merivienti O/Y, 863 F.2d 1537, 1542 (11th Cir. 1989); Ins. Co. of North America v. M/V Frio Brazil, 729 F. Supp. 826, 836 (M.D. Fla. 1990).

Applying these principles, we believe that the district court was correct to find that the container did not constitute the COGSA package and that the bill of lading was not ambiguous.  But we find that the court was incorrect not to accord greater weight both to the description of the pallets as packages in the bill of lading and to the fact that the shipper chose to package and wrap the 2,270 carton boxes onto 42 separately numbered pallets.  We also find that the court was incorrect to the extent that it based its decision on a rule requiring the smallest unit enumerated in the bill of lading to constitute the COGSA package.

Here, the bill of lading could not have been more clear.  It described the pallets in plain language as "packages."   Groupe Chegaray can point to no case where the bill of lading was not found to be ambiguous, that finds a unit explicitly referred to as a "package" to not be the COGSA package.

Parbel chose to incur the expense of packaging the 2,270 shoebox-sized cartons onto a total of 42 pallets.  While Groupe Chegaray is correct to point out that the record is not explicit regarding whether the 42 plastic-wrapped units containing the cartons were themselves each plastic-wrapped onto the pallets or

19

just plastic-wrapped together and moved around with pallets, we find this consideration to be immaterial.[11] The 42 units of plastic-wrapped cartons clearly facilitated the efficient transport of the individual cardboard boxes, and reduced any safety or damage risks that may have been involved in handling them. Under the principles laid out in Hayes-Leger and Fishman & Tobin, the fact that Parbel chose to package the cartons in these manageable units instead of shipping them loose supports our conclusion that they represent the COGSA package.

Even though the district court found that the 42 pallets were "clearly indicated" on the bill of lading as the number of packages, it reasoned, "[n]evertheless, the 'UNIT TOTALS' line indicates a greater number of items[.]" P&O Containers, 99 F. Supp. 2d at 1356. Although the majority of package limitation cases may, in fact, end up with such a result, these cases do not stand for the proposition that the smallest enumerated unit of transport always constitutes the number of COGSA packages. Significantly, many of these cases, unlike this case, involve bills of lading that are ambiguous and, hence, resolved against the carrier. See, e.g., Vegas, 720 F.2d at 630-31 (finding, in bill of lading describing goods as "Palletized master cartons, STC: 109 cartons: auto brake parts," that both

_____

[11]Nevertheless, we note that the majority of the pallets are referred to in the bill of lading as individually numbered and labeled units, suggesting that the record is silent because the fact seemed obvious at the time.

20

individual and master cartons fit into "plain, ordinary meaning" of "package," and, thus, designating 109 cartons as COGSA packages in light of "congressional purpose"); M/V Frio Brazil, 729 F. Supp. at 836 (finding bill of lading describing goods as "160 PALLETS CONTAINING: 12,000 CARTONS WITH 12 PACKAGES of 1,000 ML EACH ONE CONTAINING FROZEN CONCENTRATED ORANGE JUICE" to be ambiguous and, thus, designating 12,000 cartons as COGSA packages); but cf. Sony, 863 F.2d at 1542 (finding bill of lading describing goods as "1X40 foot container STC: 1320 Ctns. Magnetic Tapes" not to be ambiguous under Vegas and designating 1320 cartons as COGSA packages).

For the foregoing reasons, we find that the correct number of COGSA packages is 44, representing the 42 pallets plus the two outstanding cartons.[12]

II.     Claims Against Wells Fargo

_____

[12]Groupe Chegaray argues that there cannot be consistently 44 COGSA packages comprising 42 pallets plus two cartons; if two cartons can be packages, then all cartons must be packages. This argument is unconvincing. The shipper went to the trouble of packaging the cartons onto pallets. The fact that it may have been inconvenient to package two outstanding cartons onto a pallet does not prove that the pallets were themselves not packages. If anything, it supports the argument that the shipper intended for the pallets to constitute a COGSA package by bundling together loose cartons for ease of transport and handling.

21

P&O and Sea-Land also appeal the district court's final judgment dismissing their cross-claims for indemnity and contribution against Wells Fargo.[13]

At the time of the incident, Sea-Land had hired Wells Fargo as an independent contractor to provide security services at its container yard in Port Everglades. Under the relatively limited terms of the contract, Sea-Land exercised considerable control over Wells Fargo's employees. Wells Fargo was responsible for hiring, training, uniforming, equipping, supervising, directing, and discharging security officers. Wells Fargo was not responsible for creating a security scheme for the yard; this was Sea-Land's chosen responsibility.

Sea-Land's yard is operated by the use of wheeled chassis on which containers are placed and can be wheeled around by tractor, as opposed to a grounded yard in which containers are stacked upon one another and moved by crane. The yard includes a high security area where containers are locked with keyed pins that are kept under the custody of Wells Fargo guards. After visiting the container yard during the trial, the trial judge found that the spirited container was not stored in the high security area.

_____

[13]Groupe Chegaray elected not to appeal the district court's dismissal of its claims against Wells Fargo. To the extent that appellants challenge this dismissal in their brief, they lack standing. Therefore, we review only the rulings that pertain to appellants' claims.

22

The court also found that a history of security problems has plagued Sea-Land's yard.  Repeatedly, Sea-Land was put on notice of these problems by irate customers -- including P&O -- as well as by the Coast Guard, who cited Sea-Land for numerous security violations that went uncorrected.  One such violation was a missing front gate that was replaced by a makeshift gate made from an empty container wheeled in front of the yard entrance.

The court found that the container was lost sometime between Saturday, December 26, 1992, when it was discharged from the ocean vessel, and Monday, December 28, 1992, when Sea-Land discovered the loss.  Due to the holiday weekend, the terminal was closed and, under Sea-Land's direction, manned by only one guard who was required to leave his or her post at the main gate for a significant period of time in the course of making security rounds.

In light of these facts, the trial court found that Wells Fargo neither failed to perform its contractual duties nor acted negligently.  The court stated from the bench:

> What somewhat jumps at me in all this evidence is that Sealand was trying to do security on the cheap.  They were controlling nearly everything about security through their contract. . . .  Whether you want to proceed on negligence or under the contract, I don't find that Sealand has carried its burden of proof under either theory. **[R9-294]**

23

Appellants ask us to speculate about possible scenarios in which Wells Fargo security guards may have been negligent, but they fail to support their speculations with compelling record evidence. Upon independent review of the record, we find that the district court committed no clear error in its factual findings.

Appellants also argue that they are entitled, as a matter of law, to indemnification from Wells Fargo under the implied warranty of workmanlike performance. Under the warranty, a carrier may be indemnified by a stevedore, in certain circumstances, without proving negligence. See Italia Soc. v. Oregon Stevedoring Co., 376 U.S. 315, 318, 84 S.Ct. 748, 750, 11 L.Ed.2d 732 (1964); see also Smith & Kelly Co. v. S/S Concordia Tadj, 718 F.2d 1022, 1025-26 (11th Cir. 1983).

Even if the implied warranty of workmanlike performance were applicable to the facts before us, appellants are unable to establish the key element required to prevail under the theory, namely, that Wells Fargo exercised exclusive control over the lost container. See Stein Hall & Co. v. S.S. Concordia Viking, 494 F.2d 287, 290 (2d Cir. 1974) (finding presumption of breach of implied warranty of workmanlike service where cargo was in stevedore's custody and control); David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295, 299 (2d Cir. 1964) (holding

24

that a carrier is entitled to indemnification from a stevedore where the latter had possession, custody and control of the cargo and negligently misdelivered it to a thief).

Courts have uniformly held in implied warranty of workmanlike performance cases that "'liability should fall upon a party best situated to adopt preventive measures and reduce the likelihood of injury.'" Stein Hall, 494 F.2d at 293 (quoting Doak, Liabilities of Stevedores, Terminal Operators and Other Handlers in Relation to Cargo, 45 Tul. L. Rev. 752, 757 (1971)); see also, Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 171, 101 S.Ct. 1614, 1624, 68 L.Ed.2d 1 (1981) ("The approach of the indemnity cases in this Court . . . was that the stevedore was in the best position to avoid accidents during cargo operations and that the shipowner could rely on the stevedore's warranty to perform competently."); Italia Soc., 376 U.S. at 323-24, 84 S.Ct. at 754 (holding that absence of negligence does not preclude liability under implied warranty where stevedore had exclusive control and was in best position to prevent injury); David Crystal, 339 F.2d at 299 ("[L]iability should properly fall upon the party who is best situated to adopt protective measures.").

Because Wells Fargo did not have exclusive custody, possession or control, we find that it was not liable for the lost container under the warranty of

25

workmanlike performance. In fact, the roving duties of the guards would have required them periodically to *relinquish* any control that they may have had. Liability cannot fairly fall upon the party not best situated to prevent injury. Thus, we affirm the district court's dismissal of appellants' claims against Wells Fargo.

## CONCLUSION

For the foregoing reasons, we find that the district court erred in limiting appellants' liability to $500 for each of the 2,270 cartons. Accordingly, we VACATE the district court's judgment and REMAND for further proceedings. On remand, the district court must apply the $500 liability limitation to each of the 42 pallets and each of the two cartons. We also find that the district court did not err in dismissing appellants' indemnification claims against Wells Fargo. Accordingly, we AFFIRM the court's final judgment.