In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-2822 & 02-2933

INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, as
Subrogee of Lowe's Companies, Inc.,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

HANJIN SHIPPING COMPANY,

*Defendant-Appellant,*

and

O'HARE SERVICES and CHANNEL DISTRIBUTION,

*Defendants, Cross-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 5226—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED FEBRUARY 14, 2003—DECIDED OCTOBER 31, 2003

Before FLAUM, *Chief Judge*, and DIANE P. WOOD and
EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* When a container of tools
disappeared while it was in transit between China and
the Indiana warehouse of the ultimate purchaser, L.G.

Sourcing, Inc., the inevitable process of finger-pointing began. The cargo, as is common today, was shipped under an intermodal waybill and was packed in a container that could easily be transferred from one carrier to the next. All went well until the U.S. Customs Service decided to inspect the container in a facility near Chicago's O'Hare International Airport. While in the custody of private agents of the Customs Service, the container vanished. It was found some time later in a nearby city, empty. The purchaser received full payment for the loss from its insurer, Indemnity Insurance Company. Indemnity, standing in the shoes of its customer, in turn sued the shipping company, Hanjin, and the various parties involved in the diversion to the customs inspection facility, seeking indemnification.

After a bench trial, the district court ruled that Hanjin was responsible for the full amount of the loss. *Indemnity Ins. Co. of North America v. Hanjin Shipping Co.*, 206 F. Supp. 2d 927 (N.D. Ill. 2002). Our review of the relevant language in the waybill, in the light of the law governing this type of transaction, convinces us that this was error. We therefore reverse the verdict against Hanjin. In addition, Indemnity has cross-appealed from the district court's judgment dismissing its claims against O'Hare Services and Channel Distribution, two of the companies involved in the customs inspection process. We also reverse that judgment, and remand for further proceedings.

# I

L.G. Sourcing, a subsidiary of Lowe's Companies, Inc., wanted to purchase some Black & Decker power tools that were manufactured in a plant located in Shenzhen, China. (For convenience, we generally refer to both L.G. Sourcing and Lowe's itself as Lowe's, as there is no material distinction between them for present purposes.) As part of the deal, Lowe's contracted with Hanjin Shipping Company to

transport a container holding the tools from China to Lowe's warehouse in North Vernon, Indiana. The waybill covered all legs of the journey and thus involved both sea and land transport—in short, it was an intermodal contract. It named "BDC International Limited, D/B Black & Decker International Corp.," as the shipper, and L.G. Sourcing, Inc., as the consignee. In a space on the waybill labeled "Notify Party", it gave the name of Fritz Companies, Inc., of Savannah, Georgia. In some of the fine print, the waybill said:

> [d]elivery will be made to the Consignee named, or the authorized agents, on production of proof of identity at the place of delivery. . . . Should the Consignee require delivery elsewhere than at the place of delivery shown above, then written instruction must be given by the Consignee to the Carrier or his agent. Should delivery be required to be made to a party other than that named as Consignee authorization must be given in writing by the Shipper to the Carrier or his agent.

Finally, as we explain in greater detail below, the waybill provided that it was to be governed by the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, concluded in Brussels on August 25, 1924 (commonly known as the Hague Rules), which is generally in force in the United States. See 51 Stat. 233 (1924).

Initially, the shipment proceeded uneventfully. After the container arrived by ship in Long Beach, California, it was transported by rail to Chicago, where it was scheduled to be picked up by a motor carrier and taken to the Indiana warehouse. Prior to its arrival in Chicago, however, the U.S. Customs Service notified Fritz, which was Lowe's agent and customs broker, that this particular container had been selected for an intensive customs examination. Fritz, which had a written power of attorney from Lowe's to perform all

services necessary to effect the entry and clearance of Lowe's goods, accordingly notified Hanjin in writing that the goods were to be released to Land Container, a trucking company, for delivery to O'Hare Services. O'Hare Services was one of four companies operating a Centralized Examination Station for U.S. Customs in the Chicago area. O'Hare Services in turn subcontracted with a company called Channel Distribution for the performance of the tedious work of inspecting the contents of the container and storing it until it could resume its journey to the ultimate consignee.

In order to carry out the required inspection, Fritz began on August 2, 1999, by paying Hanjin the collect ocean freight due on the shipment. It then instructed Hanjin to deliver the container to Land Container, which on August 25, 1999, in accordance with Fritz's order, took the container to the Centralized Inspection Station (operated by Channel) used by O'Hare Services. On August 26, Customs Service officials examined the contents of the container and released it from custody. At that point, the shipment was intact and in good order. Channel then moved the container from the bonded customs area of its lot to the open yard. The district court found as a fact that "[a]fter Customs completed its inspection, it notified both Fritz and Hanjin that the container and its contents were released and ready to be picked up." This finding is troublesome, as all of the testimony at the trial indicated that Customs notified Fritz, but not Hanjin, and that Fritz may have communicated this message to Hanjin. Nevertheless, this discrepancy does not matter in the end, because the testimony from the witnesses called by Channel and O'Hare Services was that Channel would release the container only upon receipt of a delivery order from Fritz. No such order was forthcoming. One Fritz employee testified that they were waiting for a pick-up number from Hanjin, but she never explained why Hanjin would have had such a number.

For over a week, the container sat in Channel's unprotected yard, awaiting pickup from an authorized party. As of September 3, Channel's yard check report showed that it was still on the premises in apparent good condition. The news was not so good at the next yard check, which occurred on September 7. By then, the container was missing. On September 10, the Indiana State Police notified Hanjin that they had discovered the empty container in Calumet City, Indiana. Hanjin verified the fact that the container was no longer in Channel's lot. The goods were never recovered.

## II

Lowe's submitted a claim for the lost shipment with its insurance company, Indemnity, which paid the claim and became subrogated to Lowe's rights to recover. In its capacity as subrogee, Indemnity filed this suit against Hanjin, O'Hare Services, and Channel. (At one point Fritz was also a defendant, but it was dismissed before trial and is no longer involved in the litigation.) Count I asserted a claim against Hanjin under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. app. § 1300 *et seq.* Count II was against Fritz, and thus no longer relevant. Count III raised a common law bailment claim against O'Hare Services, and Count IV raised a common law negligence theory against O'Hare Services. Counts V and VI, respectively, raised the same two theories against Channel. Finally, Counts VII and VIII asserted that Indemnity was entitled to recover from Hanjin and O'Hare Services (again, respectively) under the Carmack Amendment, 49 U.S.C. § 14706.

With the exception of the claim against Fritz, the remainder of Indemnity's case was heard in a bench trial. The district court's jurisdiction rested on 28 U.S.C. § 1337, because of the COGSA and Carmack Amendment allegations in the complaint. It exercised supplemental jurisdic-

tion, see 28 U.S.C. § 1367, over the common law theories. The court rejected the argument that it also had admiralty jurisdiction over the case, under 28 U.S.C. § 1333, because it concluded that this was a mixed contract involving elements of both ocean and land carriage, and because the loss occurred during the inland carriage portion of the transaction. It also commented that the parties were not seeking to invoke its diversity jurisdiction under 28 U.S.C. § 1332 and that the record is devoid of the necessary evidence to determine whether diversity even exists.

On the merits, the district court first concluded that Hanjin could not be liable under the Carmack Amendment, because that law is inapplicable to a contract of carriage like this one, which originated outside the United States and was handled under a foreign through bill of lading. *Capitol Converting Equip., Inc. v. LEP Transport, Inc.*, 965 F.2d 391, 394 (7th Cir. 1992). The court also rejected the suggestion that there is a body of federal common law governing Indemnity's claim against Hanjin, and that this law supports a finding of liability. Next, it ruled that COGSA by its terms did not apply to this loss, because it covers only the period during which goods are aboard a ship. Because of a clause paramount in the waybill, however, the court ruled that the parties had effectively adopted COGSA as the rule governing the entire transaction. This meant that the case against Hanjin was ultimately a simple breach of contract action and was governed by state law (either Illinois or Indiana, with no material difference between the two). The contract required Hanjin to deliver the goods to Lowe's in Indiana; it did not do so, and the court found nothing in COGSA that excused Hanjin's nonperformance. It therefore entered judgment in Indemnity's favor for $236,032.71. It dismissed Indemnity's bailment and negligence claims against Channel and O'Hare Services, thereby resolving the entire case. Hanjin has appealed from the judgment rendered against it, and

Indemnity has cross-appealed from the adverse judgment in favor of Channel and O'Hare Services.

### III

We take up Hanjin's appeal first. Hanjin urges us to find that the district court erred as a matter of law in holding that it did not make a valid delivery of the goods when it turned them over to Land Container in accordance with the written instructions it had received from Fritz. Since neither Fritz, as Lowe's agent, nor Lowe's itself, ever issued the further written instructions that would have permitted Hanjin to complete the shipment, Hanjin claims it is not responsible for the fact that the goods never reached their ultimate destination. In the alternative, Hanjin argues that the law of the contract excused it from delivering the goods to Lowe's Indiana warehouse, because the owner of the goods (through its agent Fritz) diverted them to O'Hare Services. This diversion, it continues, amounted to an act or fault of the owner of the goods under all applicable laws. Either way, Hanjin claims that it should not be liable for any of the loss, and that the district court's judgment for $236,032.71 must be reversed.

We agree with the district court that when all is said and done, this is a simple contract action, and that an Illinois court applying its own choice-of-law rules would have selected either Indiana law or the law of the forum. No one has pointed out any salient differences between those two bodies of law, and so we will look to both, as the district court did. Both Illinois and Indiana require contracts to be interpreted as a whole. See, *e.g., OEC-Diasonics, Inc. v. Major,* 674 N.E.2d 1312, 1315 (Ind. 1996); *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 689 (Ill. 1958); *Premier Title Co. v. Donahue,* 765 N.E.2d 513, 516 (Ill. App. Ct. 2002); *Indiana Gaming Co.*, *LP v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000). In so doing, the courts of both

states stress that meaning must be given to all terms of the contract, and that the court should accept the interpretation that best harmonizes its provisions. See *Martindell, supra; OEC-Diasonics, supra.* Furthermore, both Illinois and Indiana permit parties to choose an applicable law for their contract. See, *e.g., Allen v. Great Am. Reserve Ins. Co.,* 766 N.E.2d 1157, 1162 (Ind. 2002) (Indiana choice of law doctrine favors contractual stipulations as to governing law); *Cap Gemini America, Inc. v. Judd,* 597 N.E.2d 1272, 1287 (Ind. Ct. App. 1992); *Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Ill.,* 568 N.E.2d 9, 14 (Ill. App. Ct. 1990) (indicating that Illinois follows the RESTATEMENT (SECOND) of CONFLICTS § 187 (1971) regarding the freedom of parties to choose applicable law).

While the situation before us does not present a conventional contractual choice of law clause, in which the parties select "the law of State X" or "Country Y" as the applicable law, we think that the choice of the Hague Rules in the agreement is closely analogous to those conventional clauses and thus enforceable. To say that the Hague Rules "apply," however, does not answer another question, which is to how much of the contract do they apply? Two possibilities exist: the parties might have been stipulating that the Hague Rules applied only to the international ocean shipment portion of the transaction, or they might have been stipulating that the Hague Rules applied to the entire transaction, including the overland legs. In order to answer which of these is the proper interpretation of the contract, we turn first to the language of the agreement.

The contract of carriage is contained in the non-negotiable waybill that Hanjin issued to L.G. Sourcing, which named Fritz as the party to notify on L.G. Sourcing's behalf. Whether the district court interpreted this waybill correctly is a question of law, which we review *de novo.* See, *e.g., Sea-Land Service, Inc. v. Lozen Int'l, LLC,* 285 F.3d 808, 813 (9th Cir. 2002) (*de novo* review of bill of lading); *see also*

*Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 835 (7th Cir. 2002) (interpretation of contracts subject to *de novo* review). The waybill contains a paramount clause, which reads in part as follows:

(a) This Waybill is not a bill of lading and no bill of lading will be issued. However, it is agreed that the Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this Waybill. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply in exactly the same way.

* * *

(c) The Carrier shall in no case be responsible for loss of or damage to the Goods howsoever arising before receipt of the Goods by the Carrier at the place of receipt or after delivery by the Carrier at the place of delivery.

(d) It is agreed that whenever the Brussels Convention and the Brussels Protocol or statutes incorporating same use the words "Bill of Lading" they shall be read and interpreted as meaning "Waybill."

* * *

The Hague Rules to which the waybill refers were, for all purposes relevant to this case, incorporated into U.S. law in COGSA. See, *e.g., Groupe Chegaray/V. De Chalus v. P&O Containers*, 251 F.3d 1359, 1362 (11th Cir. 2001); *Spartus Corp. v. S/S Yafo,* 590 F.2d 1310, 1315 (5th Cir. 1979). See also Carriage of Goods by Sea: Hearing on S. 1152 Before the Senate Committee on Commerce, 74th Cong., 1st Sess.

(1935); S. Rep. No. 742, 74th Cong., 1st Sess. (1935); H.R. Rep. No. 2218, 74th Cong., 2d Sess. (1936).

The first question we must address is whether the parties, through the language in this waybill, effectively extended the Hague Rules—essentially COGSA here—to the overland part of the voyage. There is nothing in COGSA itself that would preclude such an agreement. To the contrary, the statute specifically states:

> Nothing contained in this chapter shall prevent a carrier or a shipper from entering into any agreement . . . as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea.

46 U.S.C. app. § 1307. Indemnity argues that, notwithstanding this possibility, the language of the waybill set forth above does nothing more than state the truism that COGSA applies to the ocean shipping portion of this transaction.

As the Supreme Court made clear in *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534 (1995), the substance of COGSA is mandatory law that the parties to a transaction within its scope cannot modify by agreement. COGSA applies to "[e]very bill of lading or similar document which is evidence of a contract for the carriage of goods by sea *to or from* ports of the United States, in foreign trade. . . ." 46 U.S.C. app. § 1300 (emphasis added). Thus, no matter what law a Chinese court might have applied to this matter had a problem arisen before the shipment left China, COGSA provided the governing law for a tribunal in the United States with a dispute before it concerning a shipment on board a vessel bound to a port in the United States. Any clause purporting to relieve the parties of liability under COGSA would have been "null and

void and of no effect." *Id.*, § 1303(8). Thus, with respect to the ocean voyage, the parties had no power either to stipulate to some other body of contract law or to some other version of the international rules governing bills of lading, such as the later Hague-Visby Rules[1] or the Hamburg Rules.[2]

Other things being equal, this suggests that the parties were trying to accomplish something beyond a stipulation that the Hague Rules applied to the ocean portion of the contract of carriage. Otherwise, their agreement would have accomplished little or nothing. We realize that Hanjin might have used this waybill for shipments to destinations other than the United States, however, and so it is important to look further. Reading the waybill as a whole, we conclude that it can be read only as a document adopting the Hague Rules for the entire shipment, both inland and ocean. On the face of the waybill, it specifies that the place of receipt of the goods is Shenzhen, China; that pre-carriage is to be performed by Tak Lee Fat, that the port of loading is to be Yantian and the designated ship is one of Hanjin's vessels, that the port of discharge is Long Beach, California, and that the place of delivery "by on carrier" is North Vernon, Indiana. The waybill also indicates that the last of these boxes is to be completed "only when used for multimodal or through transportation." Thus, when on the reverse side of the waybill one finds the statement that the Hague Rules "shall apply to this Waybill," the only reasonable way to read that language is as an agreement to apply those rules to all phases of the trip. This makes eminent

---

[1] Protocol to Amend the 1924 International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, signed at Brussels February 23, 1968, and entered into force June 23, 1977.

[2] United Nations Convention on the Carriage of Goods by Sea, signed at Hamburg on March 31, 1978.

good sense, as compared with the inefficient alternative of applying different substantive law to the container depending on whether it is sitting on board a ship, on a rail car, or on a truck.

Hanjin's duty under the waybill was to deliver the container either to Lowe's at the North Vernon, Indiana, warehouse, or to follow any superseding written instructions for delivery that it received from Lowe's customs broker, Fritz. See *Servicios-Expoarma, C.A. v. Indus. Maritime Carriers, Inc.,* 135 F.3d 984, 992 (5th Cir. 1998) ("'Delivery' [under COGSA] occurs when the carrier places the cargo into the custody of whomever is legally entitled to receive it from the carrier."). Unless it breached that duty, it cannot be liable under the contract. Once Fritz issued the written instructions to Hanjin telling it to deliver the container to Land Container, Hanjin was both entitled to and required to turn the container over to the specified trucking company. Indeed, the Customs Service had the authority to require this inspection, see 19 U.S.C. § 1581 (authorizing customs officers to examine all cargos entering the United States and to use all necessary force to compel compliance), and Hanjin had a duty to cooperate. See 19 U.S.C. § 1433 (vessels or vehicles arriving in U.S. ports or at the border must report arrival to customs facilities and person); *id.* § 1436 (unlawful to fail to comply with § 1433). It was entirely predictable to the parties that the U.S. Customs Service might choose to inspect the contents of the container and thereby require a temporary diversion of the container from the planned itinerary. Hanjin had no reason to think that the instructions it received from Fritz were suspicious or unreasonable.

Thus, the question comes down to whether Hanjin's failure to retrieve the container from Channel's premises after the inspection was completed amounted to a breach of the contract of carriage. Hanjin argues that it had no way of knowing when the container was ready for pick-up,

because no one notified it that the inspection was completed. As we noted above, Fritz may have passed this message along informally, but Fritz never followed up with the formal written instructions to Channel that would have been required for Channel to release the container to another party. One Fritz employee, Lois Walker, testified that it was her "understanding that they [*i.e.*, the cargo] were not picked up because Hanjin did not supply the pick-up number that was needed for the trucker, the house trucker to go in and pull the box. And also they did not see a Customs release in their system." The lack of a Customs release in Fritz's system was certainly not Hanjin's fault, and in any event the district court seems to have resolved this point against Fritz in its finding of fact that Customs notified Fritz that the container was ready for pick-up.

Walker's assumption that Fritz was waiting for a pick-up number from Hanjin makes little sense, given the fact that Fritz was the party that had made all the arrangements for the shipment and thus was in possession of all relevant documentation. Fritz chose O'Hare Services, which in turn chose Channel, as the responsible parties, and there is nothing in this record to indicate that Fritz had no power to instruct Channel on who would be authorized to pick up the released container. Indeed, every scrap of evidence is to the contrary, starting with the language of the waybill, which confers the power to give instructions on Fritz, and continuing with the law of COGSA and the general law on proper delivery. That is enough, in our view, to require reversal of the district court's judgment against Hanjin.

One might be able to reach the same result through the act of shipper defense recognized in COGSA, 46 U.S.C. app. § 1304(2)(i), which provides that

> [n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
>
> (i) Act or omission of the shipper or owner of the goods, his agent or representative.

This defense is also recognized in Illinois law. See *Meyer v. Rozran*, 77 N.E.2d 454, 457 (Ill. App. Ct. 1948) ("A common carrier is an insurer of goods entrusted to him and accountable for the loss thereof or any damage thereto unless shown to have happened by the act of God or the public enemy or to have occasioned [*sic*] by an act of the shipper or someone in his position."). Although the shipper was technically Black & Decker, Lowe's was the consignee, and Fritz was the customs broker. The latter two parties arranged all of the shipment details on Black & Decker's behalf. Both Lowe's and Fritz may therefore have been acting as the shipper's agents for purposes of this doctrine. It was Fritz, the agent or representative of the shipper, who instructed Hanjin to divert the goods to this particular customs yard, thereby setting in motion the events that led to its disappearance. We need not finally resolve this, given our decision that Hanjin was not legally responsible for the ultimate nondelivery of the container to the Indiana warehouse.

**IV**

We turn finally to the cross-appeal filed by Indemnity, in which it claims that the district court should not have dismissed its claims against O'Hare Services and Channel Distribution. It relies on the general law of bailment, and within that body of law, the rules governing negligence on the bailee's part. Although there is an implicit choice of law question here as well, the parties seem to assume that Illinois law governs this aspect of the case. That assumption is reasonable, given the fact that the transfer of the container to the custody of O'Hare Services and Channel took place in Illinois and the theft from the premises was obviously also in Illinois. Following the choice of law rules that the state courts of Illinois would use, it is easy to conclude that Illinois has the most significant relation to

this aspect of the case. *Wreglesworth ex rel. Wreglesworth v. Arctco, Inc.*, 738 N.E.2d 964, 971 (Ill. App. Ct. 2000). We therefore proceed on that basis.

Indemnity argues that it has stated a *prima facie* case for bailment, and that there is a presumption of negligence arising from the fact that the container was not returned. A bailment "is the delivery of property for some purpose upon a contract, express or implied, that after the purpose has been fulfilled, the property shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept until he reclaims it." *American Ambassador Cas. Co. v. Jackson*, 692 N.E.2d 717, 721 (Ill. App. Ct. 1998) (citations omitted). In order to prevail on a bailment claim, Indemnity must show (1) an express or implied agreement to create a bailment, (2) delivery of the property in good condition, (3) acceptance of the property by the bailee, and (4) the bailee's failure to return the property, or the return of the property in damaged condition. *Id.* Once the plaintiff has satisfied these requirements, there is a presumption of bailee negligence that may be rebutted if the defendant-bailee presents "sufficient evidence to support a finding that the presumed fact did not exist and that the defendant was free from fault." *Id.*

Channel and O'Hare Services respond with several arguments. First, Channel insists that it was merely a company that contracted with the true bailee, O'Hare Services, and thus is not liable under the law of bailment. O'Hare Services makes a mirror-image argument, claiming that although it was the licensed Customs Examination Station, it had subcontracted out all responsibility to Channel and thus there was no evidence that O'Hare Services itself ever agreed to accept or receive the container. O'Hare Services adds that it was never in exclusive physical possession of the container, even if it played some role in the inspection process. The net effect of these arguments, were we to accept both of them, is that no one

could be held responsible, as both Channel and O'Hare Services have claimed that the other was at fault. But of course some entity must have had the goods when they were taken, and it was not either Lowe's or Hanjin. Finally Channel and O'Hare Services argue that even if each one was a bailee, they rebutted the presumption of negligence by showing that their handling of the container was in accordance with Customs rules and industry standards.

The district court granted judgment as a matter of law for both O'Hare Services and Channel. We must therefore take the facts in the light most favorable to Indemnity, for purposes of appellate review, and our review is *de novo*. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). From that point of view, the record shows that the security measures Channel used for this container were less than those it had at its own disposal. For example, gates equipped with locks were left unlocked, and pins were not used to make it more difficult to steal the container. Leaving unsecured containers out in a yard with unlocked gates might be an unreasonable way to handle a cargo valued in the hundreds of thousands of dollars. Furthermore, this is not a case in which lawyers with 20/20 hindsight imagine an ideal world with perfect security measures. It is a question of Channel's failure to use precautions it had readily at hand. Perhaps, of course, Channel has an explanation for its lack of concern. The evidence of industry custom in this record is thin. But on the record as it stands, we think it was wrong to find as a matter of law that neither O'Hare Services nor Channel could have been found to be negligent bailees. On remand, the parties will have an opportunity to explore further the question whether O'Hare Services, as the authorized inspector, bears principal responsibility as the bailee, or if Channel was either the primary or a co-equal bailee. Even if O'Hare Services was the original bailee, the parties can also explore the question whether Channel should be viewed as merely a subcontractor of O'Hare Services, or if

Channel should be regarded as a sub-bailee that owed the same kind of duties to O'Hare Services as O'Hare Services owed to the shipper.

**V**

For the reasons we have explained, we find that the judgment against Hanjin must be REVERSED. The judgment dismissing O'Hare Services and Channel Distribution is VACATED and that part of the case is REMANDED to the district court for further proceedings consistent with this opinion.

A true Copy:

> Teste:

> _____
> *Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—10-31-03